**In re J.A. & L.A., Appellees.**

**Nos. 89–1352, 89–1353, 90–650 and 90–651.**

District of Columbia Court of Appeals.

Argued June 20, 1991.
Decided Dec. 20, 1991.

Charles A. Moran and Suzanne Bryant, for appellant.

Sidney R. Bixler, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellee, District of Columbia.

Mitchell Linde, for appellee, J.A.

David Passamaneck, for appellee, L.A.

Before ROGERS, Chief Judge, and FERREN, Associate Judge, and PRYOR, Senior Judge.

PER CURIAM:

On February 7, 1989, the District of Columbia government filed a neglect petition against appellant alleging, pursuant to D.C.Code § 16–2301(9)(A), (B) (1989 Repl.), that her two children were abused and neglected. At the conclusion of a bench trial, the judge found that the children were neglected and abused, and placed them temporarily in the care of their maternal grandmother. At a subsequent disposition hearing, the judge granted custody of the children to their father. The mother contends on appeal that (1) D.C.Code § 16–2301(9)(A) is unconstitutionally vague on its face, and that (2) the trial judge violated his duty of impartiality by engaging in *ex parte* contacts during the trial and exhibiting extreme bias and hostility against her during the trial, thereby denying her a fair trial. Finding the facial attack on the statute unpersuasive, but finding an appearance of partiality that is not harmless under the circumstances, we conclude that a new trial is required before a new judge; accordingly, we reverse and remand the case to the trial court.

I

J.A., a boy of ten at the time of trial, and his sister L.A., who was then eleven, lived in a household comprised of their divorced mother and three women. Apart from a joint business venture in which the women were engaged, there was testimony that the women held common religious beliefs and lived a communal lifestyle that included joint supervision of J.A. and L.A.

On February 6, 1989, the day of J.A.'s birthday, the assistant principal of his school testified that he saw a fresh loop-shaped mark near J.A.'s eye and old scars on his back. J.A. told him that he had been beaten that morning for bringing home a bad report card, and that he had been beaten on previous occasions by the women who lived at his home. J.A. also expressed fear of returning home.

A police officer from the Youth Division, who was called to investigate, observed the scars on J.A.'s arm, back and legs. J.A. told the officer that he was beaten by all three of his mother's housemates, on numerous occasions, with extension cords and belt buckles, after being forced to strip to his underwear. The officer testified that J.A. was crying and very upset when she spoke with him and he was afraid to return to his home. The officer also testified that, in her experience, a beating with an extension cord causes a loop-shaped mark.

Both children testified. J.A. told the trial judge that he was beaten by all the women, except his mother, and that he had been beaten often. He said that he screamed and cried during and after he was beaten. He stated he was beaten for getting a bad report card and that he had trouble with his schoolwork. He told the judge that his mother had to sneak in to help him with his work so the other women would not find out or they would be angry with her.

L.A. testified that she too was beaten with belt buckles and extension cords and forced to take off her skirt or shirt. She said that her brother was whipped more often, usually for having a bad report card, and that she could hear him screaming and crying from the second floor while she was in the basement. Both children testified that they did not want to live with their mother and her housemates.

The mother and one of her housemates testified that the group worked together to raise the children, and that they shared the same strict philosophy towards discipline. Delphine Jones stated that she spanked

J.A. with a belt or an extension cord, and that she did so on his birthday because of a bad report card. She denied hitting him on his face. The mother explained that she believed strict discipline was necessary to raise children, and that she had approved of the beatings they received, even condoning the use of an extension cord, thinking it would not really harm them.

At the conclusion of the trial, the judge found that the children had been subjected to continuing physical abuse which the mother had failed to prevent. The judge also found that the mother's failure to protect her children severely affected the children's emotional wellbeing. The judge concluded that they were neglected within the meaning of the statute and placed them in the temporary care of their maternal grandmother.

Two disposition hearings were held after the trial. The first, on October 16, 1989, was to review the children's progress and situation. The judge concluded that the children should remain with their grandmother until the next review in six months. The second hearing was conducted on April 16, 1990. At that time the children's father had filed a Motion for Review of Placement and to transfer custody to himself. The mother filed an opposition to the motion. At the end of the hearing, the judge ordered that the children should be placed with their father.

## II

The mother contends that D.C.Code § 16–2301(23), defining abuse of a child, is facially vague and therefore unconstitutional.[1] She maintains that the definition fails to establish any criteria by which to determine what type of spanking of a child constitutes excessive corporal punishment. We disagree.

The Supreme Court has made clear that vague statutes offend three separate due process principles. First, "[v]ague laws may trap the innocent by not providing fair warning" of prohibited conduct. Second, by failing to proscribe clear standards for those charged with enforcement, vague laws make possible arbitrary and capricious enforcement policies. Third, in the First Amendment context, vague laws may chill a much broader range of conduct than is otherwise permissible. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Appellant focuses her argument on the second principle—the possibility for arbitrary enforcement—particularly in a case where judicial impartiality has been called into question.

D.C.Code § 16–2301(9)(A) provides that the term "neglected child" means a child:

(A) who has been abandoned or abused by his or her parent, guardian, or other custodian.

D.C.Code § 16–2301(23) defines the term "abused:"

The term "abused" when used with reference to a child, means a child whose parent, guardian, or custodian inflicts or fails to make reasonable efforts to prevent the infliction of physical or mental injury upon the child, including excessive corporal punishment or an act of sexual abuse, molestation, or exploitation.

▆▆▆ It is uncontroverted that a statute must define the scope of the conduct it seeks to prevent. *See In re B.K., supra* note 1, 429 A.2d at 1334; *see also Roth v. United States,* 354 U.S. 476, 491, 77 S.Ct. 1304, 1312, 1 L.Ed.2d 1498 (1957). This is particularly important in criminal statutes where the penalty for a breach is severe, *see In re S.K.,* 564 A.2d 1382, 1388 (D.C. 1989), or where a statute affects First Amendment rights. *See United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975). However, stat-

---

1. The mother was also charged under another section of the neglect statute, D.C.Code § 16–2301(9)(B), but does not allege that it is facially vague. Section 16–2301(9)(B) defines a neglected child as one "who is without proper parental care or control, subsistence, education as required by law, or other care or control neces-

sary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian." The court has held that this section of the statute is not unconstitutionally vague. *In re B.K.,* 429 A.2d 1331 (D.C.1981).

utes not involving First Amendment claims of vagueness are to be evaluated by the particular facts of the case. *Id.* Thus, statutes which are remedial in nature may be more broadly construed. *See In re S.K., supra,* 564 A.2d at 1389.

■ In neglect proceedings, the best interests of the child are of prime importance.[2] *In re B.K., supra* note 1, 429 A.2d at 1334. A flexible gauge is, therefore, required to give the trial court the latitude necessary to deal with the particular circumstances of each case. *Id.* The determination of "best interests" will vary depending on such factors as the "health, age, size, and intelligence of the child involved, as well as the circumstances of the particular incident which warranted the disciplinary action." *In re S.W.,* 290 N.W.2d 675, 678 (N.D.1980).

In *In re B.K., supra* note 1, the court evaluated the constitutionality of two other sections of the neglect statute in the face of a vagueness challenge. D.C.Code §§ 16-2301(9)(B) & (C). In holding that these sections provided clear guidelines for a trial judge to determine whether a child is neglected, the court stated that the statute requires examination of the particular facts of each case and therefore it must be written broadly to provide the court with sufficient flexibility. *In re B.K., supra* note 1, 429 A.2d at 1334.

The court has earlier been presented with a vagueness challenge to the statutory section at issue here but declined to consider the issue because it was raised for the first time on appeal, and the section was not "clearly unconstitutional." *See In re S.K., supra,* 564 A.2d at 1384 n. 2. In that case, the court affirmed the trial judge's finding of abuse based on evidence that a child with severe mental problems was beaten with a belt by the mother, who was aware of the child's problems. The court stated that, under those circumstances, the finding of abuse "clearly [fell] within the express terms prescribed by the statute" which "prohibits excessive corporal punishment." *Id.*

■ Similarly, in the instant case, the statutory bounds were sufficient for the trial judge to determine whether there was neglect. The evidence of the frequent beatings of both children, resulting in permanent physical scars, is plainly encompassed by the definition of "excessive corporal punishment." D.C.Code § 16-2301(23). The mother's failure to prevent the abuse was a clear violation of the statutory requirement to prevent the infliction of physical or mental injury. Accordingly, we hold that D.C.Code § 16-2301(23) is not unconstitutionally vague, but provides the requisite flexibility for a trial judge to determine neglect and abuse based on individual circumstances.

### III

The mother also contends, notwithstanding the vagueness of the statute, that she was denied a fair and impartial trial because the trial judge impermissibly engaged in *ex parte* contacts during the trial and was biased against her at the trial and disposition hearings.

### A

■ During the trial, the trial judge obtained and read the court file of the children's parents' divorce proceedings. The judge also engaged in an out-of-court telephone conversation with the probation officer regarding the case. Appellant maintains that these *ex parte* contacts were improper and compromised the trial judge's required impartiality.

■ A fair trial requires an impartial decision maker, whether it be the judge or a jury. *Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3105–06, 92 L.Ed.2d 460 (1986). Although a trial judge properly plays an active role in the course and con-

---

**2.** The mother contends that the result here is as severe as any criminal penalty because the trial judge intends the father to have permanent custody. However, the trial judge did not give permanent custody to the father, and the placement is subject to continual review. D.C.Code § 16-914 (1989 Repl.). Furthermore, the instant appeal involves a civil suit; no criminal charges have been filed against the mother for abuse or neglect.

duct of the trial, *see Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933); *Perry v. United States*, 364 A.2d 617, 620 n. 4 (D.C.1976); *Womack v. United States*, 350 A.2d 381, 382–83 (D.C.1976), the judge may not "permit private views, arguments or communications designed to influence ... his [or her] judicial action."[3] *See Davis v. United States*, 567 A.2d 36 (D.C.1989) (judge may not act as independent investigator).

Because the mother raises this issue for the first time in this court and does not allege that the *ex parte* contacts were the source of the trial judge's alleged bias, *see Belton v. United States*, 581 A.2d 1205, 1212 n. 7 (D.C.1990); *Davis, supra,* 567 A.2d at 42, our review is for plain error. *Allen v. United States*, 495 A.2d 1145, 1150–54 (D.C.1985). Assuming without deciding, that the trial judge's actions were inappropriate, we find no plain error.[4]

## B

■■■■ The mother maintains that the trial judge demonstrated prejudice against her because of his perception of her lifestyle and that, as a consequence of his bias, denied her a fair trial and disposition proceeding. We apply the harmless error test of *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), adopted by this court in *Scott v. United States*, 559 A.2d 745 (D.C. 1989) (en banc).[5]

Canon 3(C)(1)(a), American Bar Association Code of Judicial Conduct, provides:

(1) A judge shall disqualify himself [or herself] in a proceeding in which [the judge's] impartiality might reasonably be questioned, including but not limited to instances where:

(a) [the judge] has a personal bias or prejudice concerning a party....

■■■■ In order not to undermine the public confidence in the judiciary, the requirement of impartiality pertains not only to actual impartiality, but also to the appearance of impartiality. *Scott, supra,* 559 A.2d at 749; *see also Liljeberg v. Health Servs. Acquisition Corp., supra,* 486 U.S. at 869–70, 108 S.Ct. at 2207–08. Plainly, a substantial allegation of judicial bias or prejudice raises serious concerns in the equation of simple fairness. In an effort to evaluate what may be a frivolous claim,

---

3. Canon 3(A)(4), American Bar Association Code of Judicial Conduct, as amended by the Joint Committee on Judicial Administration, October 30, 1974, effective November 14, 1974, provides:

 A judge should accord every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law. He should not permit private interviews, arguments or communications designed to influence, as distinguished from objectively assist, his [or her] judicial action, where interests to be affected thereby are not represented before him [or her], except in cases where provision is made by law for ex parte application.

4. Without deciding whether the *ex parte* contacts in this case violate Canon 3(A)(4), we note that, although the trial judge obtained the divorce file, he made it available to all of the parties and as such it was, arguably, part of the record. According to the trial judge, the telephone conversation with the probation officer did not involve a non-participant or cover new ground outside the four corners of the courtroom. *See Greenhow v. United States*, 490 A.2d 1130, 1136 (D.C.1985).

5. We need not decide whether plain error is ever an appropriate standard when a claim of judicial bias arising out of conduct during a trial is raised on appeal. Because the mother made a motion during the trial for the trial judge to recuse himself and made a motion for a mistrial, our review is for harmless error. *Cf. Hawthorne v. United States*, 476 A.2d 164, 169–70 (D.C.1984) (motion for mistrial preserved error for review on appeal on a less stringent standard than plain error); *Watts v. United States*, 362 A.2d 706 (D.C.1976) (en banc) (reason for requiring contemporaneous objection is to afford the trial judge an opportunity to rectify or mitigate the error). Where *ex parte* contacts are an alleged source of bias, the court has already decided that it will apply a harmless error test in the absence of objection during trial. *See Scott, supra,* 559 A.2d at 755–56 ("it would hardly be appropriate to place on a criminal defendant the burden to attack a judge's integrity. Rather, the duty to ensure judicial conduct in accordance with the Canons resides, at least in part, with this court") (footnote omitted); *Belton, supra,* 581 A.2d at 1212 ("a judge should know the ethical restraints on the judicial office; a defendant should not be penalized on appellate review for failure to point out to a judge the ethical rules which the judge should know without coaching"); *Turman v. United States*, 555 A.2d 1037 (D.C.1989).

this jurisdiction has a practice embodied in Super.Ct.Civ.R. 63–I, which requires a party alleging bias to file, in good faith, an affidavit asserting the basis for the claim prior to the proceeding. When this is properly done, such judge shall proceed no further. The court has also stated that the alleged bias or prejudice must arise from an extrajudicial source and not simply from evidence presented to the court. *In re Bell*, 373 A.2d 232, 233 (D.C.1977).

■ These pretrial procedures are inapplicable in the instant case, however, because the alleged bias was unknown to the mother until the conduct of the trial judge was observed during the trial. It was only after the trial began that the trial judge made his personal feelings known. At that juncture, the mother's oral motion for recusal was denied. In this sense, this case is similar to our decision in *Scott* and the decision of the Supreme Court in *Liljeberg*. In each instance, the litigant did not have knowledge prior to trial of the asserted basis for recusal. Here, unlike *Bell*, *Scott* or *Liljeberg*, the challenge was not made before or after the proceeding, but during trial. Although *Liljeberg* itself involved a conflict of interest, the court has acknowledged that the same analysis is appropriately applied to appearances of partiality; the concern, that a judge be impartial and appear to be so, is no less at issue when the judge's personal views appear to interfere with the judge's ability to be impartial than where there is a direct conflict of interest. *See Belton*, *supra*, 581 A.2d at 1213 (applying *Liljeberg* to judge's *ex parte* contacts in determining whether Canon 3(A)(4) or Canon 3(C)(1) was violated).

■ For a multitude of obvious reasons, the court must address this kind of challenge with the utmost care. Recognizing the infinite responsibilities of a trial judge, the court's intent has always been to remove this kind of question from the easy reach of frivolity or trial tactics and yet maintain the necessary core of judicial neutrality. Indeed, it bears repeating that a trial judge bears the responsibility for the orderly and fair administration of a trial and is not to be merely regarded as a referee. *See Greenhow*, *supra*, 490 A.2d at 1136. A judge is not a "mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." *Quercia*, *supra*, 289 U.S. at 469, 53 S.Ct. at 698–99. Moreover, within limits, a judge has "not only the right but the duty … to participate directly in the trial, including the propounding of questions when it becomes essential to the development of the facts of the case." [6] *Womack*, *supra*, 350 A.2d at 383 (citations omitted). This is particularly true where the court sits without a jury and the trial judge functions as the trier of fact. Clearly, a trial judge is accorded more leeway regarding his participation in the trial than when he or she sits with a jury.

■ In cases involving children, whether the issue is neglect, custody or termination of parental rights, the overriding statutory goal is the best interests of the child. The statutes and our caselaw make clear that the child's interests are of paramount importance. D.C.Code § 16–2320(a) (1989 Repl.). *See In re S.K.*, *supra*, 564 A.2d at 1388; *In re K.J.L.*, 434 A.2d 1004, 1006 (D.C.1981); *In re N.M.S.*, 347 A.2d 924, 926 (D.C.1975). A determination of the best interests of the child places a responsibility on the judge to know as much as possible about the entire situation. *See In re S.K.*, *supra*, 564 A.2d at 1389. Thus we confront the dual considerations of the judge's obligations to find and resolve relevant facts, and, at the same time, to preside impartially and to appear to do so.

■ It is fair to say that the record reflects extensive, increasingly hostile questioning of the mother and her house-

---

**6.** Of course, such participation is limited to specific situations and should be exercised sparingly. *Cf. Davis*, *supra*, 567 A.2d at 39–40 (trial judge cannot act as investigator). Moreover, although the court has no occasion in the instant case to define specific instances, there will be situations in which a judge must undertake recusal *sua sponte* for that is what the plain language of Canon 3(C) contemplates.

mate by the trial judge about their lifestyle. As the trial progressed, in addition to the treatment of the children, the judge pressed aggressively into the private practices and habits of the women in the home.[7] He made specific findings of fact that "[u]nder their living arrangements [the mother] and Ms. Jones share the same bed," and that "[a]ll four women share one bedroom in which there are two beds." Some of the judge's inquiries into the mother's sexual relationships with her housemates and with men, and the probing as to the living arrangements and "lifestyle" were parts of the whole "mosaic" and, as such, not necessarily improper. But the tone of the inquiries, as is clear from the transcript, as well as the trial judge's comments, can only be taken as clearly demonstrative of a significant level of bias. Not simply such conduct, but the suggestion of personal distaste for the mother's living arrangements gave the appearance that the judge could not view the evidence as an impartial factfinder. Indeed, the judge commendably acknowledged that some of his behavior was ill advised stating, "if we were before a jury, this would have been a mistrial after questions like that and in that manner." Regrettably, he did not recuse himself at that point, *see Liljeberg, supra,* 486 U.S. at 861, 108 S.Ct. at 2202–03, and the ill advised conduct and appearance of personal distaste did not thereafter cease, and even continued into the disposition hearings.[8] Nevertheless, the judge was of the opinion that his view of the mother's relationship with her housemates and her lifestyle would not affect his decisions in the case.[9]

Although we do not decide the nature of the judge's obligation to reveal to the parties the information relied upon for a decision, it may be considered by the reviewing court in determining bias. *See Sloan v. United States,* 527 A.2d 1277 (D.C.1987) (per curiam) (no appearance of impropriety found where court stated it would not use information obtained after trial in sentenc-

---

7. For example, regarding the sleeping arrangements of the four women the judge inquired of the mother:

> THE COURT: Is there some reason that the two of you slept in one bed? You are grown women. Is there some reason why?
> WITNESS: Yes, there was a reason ... A room factor ... The limitation of space.
> COURT: You know, we could probably get a clearer understanding of exactly what is the big mystery in this case if you could give me a very truthful straight answer to one question.
> WITNESS: Yes.
> COURT: Do you have a sexual relationship with Gail Jones?
> WITNESS: I have never.
> COURT: Well, then, let me approach it from another way ... Since Ms. Gail Jones moved in your home five years ago ... and the two of you have slept in the same bed for five years ... have you had sexual relations with any males?
> WITNESS: No.
> COURT: No men?
> WITNESS: No.
> COURT: No women?
> WITNESS: No.
> COURT: So, you have made a monastery of your home since that time?

8. The record in the subsequent hearings shows that the judge turned a deaf ear towards those advocating eventual reunification of the mother and her children. During the first disposition hearing, the judge refused to allow appellant to bring her housemates for counseling with the children stating:

> [I]f she chooses not to participate in this counseling because she wants Delphine Jones and Gail Jones to also be a part of the counseling, then fine, don't participate. But that will certainly influence how the Court comes out on who should have custody of the children.
> I'm simply going to consider it whenever there is a motion for the Court to change custody or reconsider this decision today, because by golly, without participating in counseling with those children, it ain't likely that my mind will be changed. You can take it up with the Court of Appeals.

At the second disposition hearing, counsel for the District of Columbia and the *guardian ad litem* for the children both urged the view that eventual reunification with the mother was possible, even desirable. The trial judge, who had ordered custody be given to the father stated, "I don't see this as a temporary placement."

9. During the trial the judge stated:

> Somebody alluded to the possibility of a lesbian relationship existing among these women, and there have been cases that have found ... where that type of lifestyle is not a central question in whether or not the welfare of the children is being adversely impacted.
> There has been a denial and there is not proof which I can find that there exists lesbian relationships, so that really isn't a factor in my assessment of the evidence.

ing decision). Taking the trial judge's assurance at face value, *see* note 9, *supra*, the instant case could be viewed as distinguishable from those situations where the trial judge's partiality may have influenced the decision. *See Belton, supra,* 581 A.2d at 1213; *Turman, supra* note 5, 555 A.2d at 1039. There was evidence in the record to support the judge's conclusion that the children were neglected and abused. The uncontroverted evidence of frequent beatings with belts and extension cords that had left permanent scars could be found to constitute excessive corporal punishment under the statute. *See In re S.K., supra,* 564 A.2d at 1383. The evidence that the mother had given her tacit approval to the beatings and that her failure to protect her children, compromising their emotional security and happiness, could also be found to satisfy the statutory definition of neglect. Thus, it is entirely possible that, despite the credibility determinations made, the trial judge could find by a preponderance of the evidence that the children were abused and neglected. *See In re B.K., supra,* 429 A.2d at 1333.

 Nevertheless, having found that the trial judge's conduct clearly demonstrated a significant level of bias reflecting personal distaste towards the mother, the court must apply the tests of *Scott* and *Liljeberg* to determine whether the trial was fatally tainted. Our standard of review of the claim itself is an objective one. Referring to the Code of Judicial Conduct, the court stated in *Scott* that the test is whether the impartiality of the judge might reasonably be questioned. *Scott, supra,* 559 A.2d at 748–49. The same test is applied to the federal judiciary. 28 U.S.C. § 455(a); *see Liljeberg, supra,* 486 U.S. at 847, 108 S.Ct. at 2194; *United States v. Barry,* 938 F.2d 1327, 1340 n. 15 (D.C.Cir. 1991). In applying the test, moreover, the court must not lose sight of the fact that the issue is not whether there was suffi-

cient evidence to affirm the trial judge's finding of abuse; far more is at stake. *Scott, supra,* 559 A.2d at 750 ("the traditional harmless error rule ... presumes the existence of an impartial judge," and its use "would be inconsistent with the goal of Canon 3(C)(1) to prevent even the appearance of impropriety."). *Id.* at 751 ("a defendant is not required to show prejudice from a violation of the standard set by Canon 3(C)(1) as would affect the outcome of the trial in order to be entitled to the extraordinary writ of mandamus.") (footnote omitted). As the Supreme Court observed in *Liljeberg, supra,* 486 U.S. at 864, 108 S.Ct. at 2204, "[t]he problem is that people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges." If there is an appearance of impropriety, the *Liljeberg* harmless error test requires, in the context of the entire proceedings, consideration of three factors: (1) the risk of injustice to the parties in the particular case, (2) the risk that the denial of relief will produce injustice in other cases, and (3) the risk of undermining the public's confidence in the judicial process. *Liljeberg, supra,* 486 U.S. at 864, 108 S.Ct. at 2204; *see Belton, supra,* 581 A.2d at 1215; *Scott, supra,* 559 A.2d at 752–53.

The risk of injustice to the mother is clear regarding the disposition. If the trial judge's personal feelings preclude eventual reunification, she has lost custody of her children, which she may never regain.[10] It is not clear, for example, whether the judge's personal feelings about the mother's alternative lifestyle, reflected in his questions at trial and findings of fact, made it impossible for him to consider reunification if there were adequate assurances that the child no longer risked undue corporal punishment. There also is a risk of injustice to the children. Indeed, the children must be assured that their mother was not treated unfairly by the judicial

---

10. It is often the practice for judges sitting in Family Division to retain their jurisdiction in the case even after they have moved to another division of the Superior Court. The purpose is to ensure a depth of knowledge and understanding of the situation that would otherwise be lost. Even though the mother has not been permanently deprived of custody, she maintains that as long as the same judge presides she will never be able to receive a fair and impartial hearing.

system; if they, or she, think she was, it can have a lasting adverse consequence.[11] The risk of injustice in future cases is obviously substantial were an affirmance by the court to suggest that behavior clearly demonstrative of a significant level of bias reflecting personal distaste toward a party is acceptable judicial conduct. Finally, the risk of undermining the public confidence in the integrity of the judicial process is greatly increased where no consequences flow from this type of judicial conduct.

Whether viewed as a case of judicial bias and prejudice, as those terms are used in our decisions, or simply as an instance where the judge's behavior passed beyond reasonable bounds to display personal bias, we conclude that not only the appearance of impartiality, but fairness to the litigants requires that the judgment be reversed. Undue inquiry into the mother's sex life and the other statements on this record indicating a significant level of bias cannot be deemed harmless. Personal views appeared to intrude upon the judge's conduct of the proceedings. Given the very fragile nature of public confidence in the judicial system, *see Liljeberg, supra,* 486 U.S. at 862, 108 S.Ct. at 2203; *Scott, supra,* 559 A.2d at 752–53, there is no basis on which to separate the disposition from the fact-finding proceedings; the same judge presided at both, and his treatment of the parties and witnesses infected the entire proceedings and undoubtedly affected their view of his factual findings as well as the ultimate disposition of the case.[12] *Lilje-*

*berg, supra,* 486 U.S. at 863, 108 S.Ct. at 2203 (traditional harmless error test inappropriate where appearance of partiality taints the entire proceeding); *Scott, supra,* 559 A.2d at 751 n. 10 ("inevitable [that] the parties 'would entertain a significant doubt that justice would be done in the case,' and 'wonder whether [the judge] might not at some unconscious level favor [one party over another]'" (quoting *Pepsico Inc. v. McMillen,* 764 F.2d 458, 460, 461 (7th Cir. 1985))). Indeed, the children must be assured that their mother was not treated unfairly by the judicial system; if they, or she, think she was, it can have a lasting adverse consequence.

Accordingly, because the trial judge's conduct, which was clearly demonstrative of a significant level of bias, left an impermissible taint on the proceedings, we reverse and remand for new proceedings before a different judge.

PRYOR, Senior Judge, concurring in part, and dissenting in part:

I agree with much of the majority opinion. However, I would affirm in part, and reverse in part.

In circumstances where there was uncontroverted evidence of a history of beatings with belts and extension cords that left visible and permanent scars, there is hardly dispute on the merits of the findings of neglect and abuse. Nonetheless, as the trial continued, some of the questions and comments of the presiding judge became

---

11. Nor is there any jurisprudential principle on which the court could establish a different harmless error standard for cases where children are involved. No claim has been made in the instant case that the children would be harmed by another trial. There is nothing in the transcript to suggest, moreover, that the children were roughly treated during their examination by counsel, or that they were traumatized by testifying. They remain, so far as the record shows, in their father's custody, and the new trial judge could well determine that their best interests require preservation of the status quo during a new trial.

12. By deciding to sustain the neglect ruling but to remand for a new disposition hearing before a different judge, our dissenting colleague gives inappropriate consideration to the fact that the

issue is an appearance of impropriety, that the trial judge's remarks creating an appearance of bias occurred during the hearing on neglect as well as during the hearings on disposition, and thus that both segments of the proceeding are tainted. By suggesting that the neglect finding can be upheld, our colleague effectively says that given substantial evidence of neglect, an appearance of partiality will not taint the neglect analysis, even though it will taint the disposition. We do not understand how appearance of bias can properly be bifurcated in that way. In effect, our colleague says that it will take a showing of actual bias, not merely an appearance of bias, to taint a neglect finding. We find no basis for such an analysis in the cases, and, therefore, disagree.

more hostile to the mother of the children. Indeed the judge, himself, recognized this as a problem. Thus, in keeping with the Canons of judicial conduct, serious questions of judicial impartiality were introduced into the proceedings.

Generally, in cases of this nature, alleged judicial bias must have arisen from an extrajudicial source and rest on some basis other than what the judge learned from participation in the case. *In re Bell,* 373 A.2d 232, 233 (D.C.1977). This jurisdiction has a practice, embodied in Super.Ct.Civ.R. 63–I, which requires a party alleging bias to file, in good faith, an affidavit asserting the basis for the claim prior to the proceeding. When this is appropriately done, such judge shall proceed no further.

In this instance, appellant responds that, prior to trial, there was no known identifiable personal basis for seeking recusal. It was only during the proceedings, that the judge's behavior caused concern. This is an important point of focus. Although the requirement of judicial impartiality, and the appearance of same, applies to all proceedings, we must consider whether the assertion of a conflict of interest on the part of a judge is essentially no different—for purposes of appellate review—than intemperate judicial behavior. Of course, our recusal rule, and the decisions in *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), and *Scott v. United States,* 559 A.2d 745 (D.C.1989) (en banc), specifically address the former circumstance. Thus, the *Liljeberg* analysis for harmless error looks only to the (1) risk of injustice to the litigants, (2) the risk of injustice in other cases, (3) and the risk of undermining public confidence in the judiciary.

Recognizing that the requirements of judicial impartiality, and the appearance of impartiality, apply with equal force to the instant case, it is my view that the nature of the present assertion—that the judge's intemperate courtroom behavior reflected at least the appearance of partiality—makes our review more akin to the usual review for harmless error. That is, we should assuredly include in the consideration of factors the weight of the evidence.

In a context, as here, where the findings of abuse and neglect are virtually beyond dispute, but where the challenge to the disposition decisions do raise unanswerable questions regarding at least the appearance of judicial impartiality, it is my view that we should remand the case for only a new disposition hearing. In doing so, I believe we would be entirely faithful to the concerns and protections afforded by the requirement of judicial impartiality, and the appearance of it, but we legitimately need not order a second "trial" regarding the underlying events. The thrust of the challenge in this case is not so much to relitigate the treatment of the children, but rather to get a balanced or fair hearing on the future course of action for all the persons involved. The children, of course, are not litigants, but merely passive participants in a procedure designed to recognize everyone's rights, but also to serve their best interest. In this unusual situation, I think we can prudently remedy the problem by a remand for a new disposition hearing.

The majority opinion, at note 12, states that the dissent overlooks the fact that the primary issue concerns the appearance of bias. Starting with the premise that not every error of this nature requires a per se reversal, I suggest that our true difference turns on the appropriate scope of harmless error review in the present circumstances.