Demetrius D. PLUMMER, Appellant,

v.

UNITED STATES, Appellee.

No. 01–CF–1538.

District of Columbia Court of Appeals.

Argued Jan. 25, 2005.

Decided Jan. 28, 2005.*

---

* The decision in this case was originally issued as an unpublished Memorandum Opinion and Judgment on January 28, 2005. The court granted appellant's consent motion to publish.

Robert S. Becker, Washington, appointed by the court, for appellant.

Susan A. Nellor, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher, Elizabeth Trosman, and Suzanne C. Nyland, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, GLICKMAN and WASHINGTON, Associate Judges.

SCHWELB, Associate Judge:

A grand jury indicted Demetrius D. Plummer on three counts of distribution of cocaine, in violation of D.C.Code § 33–541(a)(1). Each count arose from Plummer's alleged sale of crack cocaine to Patrick Hughes, a "special employee" of the Metropolitan Police Department working under cover, on three separate dates: December 1, 1999, February 18, 2000, and April 7, 2000.

At Plummer's first trial, which began on March 28, 2001, the trial judge declared a mistrial on April 4, 2001, after the jury was unable to reach a unanimous verdict on any of the three counts. At Plummer's second trial, which began on August 28, 2001 and ended on September 5, the jury found Plummer guilty of distributing cocaine on December 1, 1999, but was unable to reach a unanimous verdict on either of the other two counts.[1] The judge sentenced Plummer to imprisonment for a term of no less than ten years but no more than thirty years, but suspended execution of all but five years.[2]

On appeal, Plummer contends, *inter alia*, that the judge erred by permitting jurors to propose questions for the judge to pose to witnesses, by overruling defense objections to certain questions proposed by jurors, and by improperly examining a defense witness as a follow-up to juror-initiated questions. Plummer also claims, more generally, that the judge was biased against him and that she failed to conduct the trial in an impartial manner. We affirm.

## I.

## THE TRIAL COURT PROCEEDINGS

In 1999, the Police Department initiated "Operation Blockbuster," a narcotics investigation centered upon the Sursum Corda Cooperative, a housing development located in northwest Washington, D.C. In connection with this operation, the police equipped an automobile with a video camera which was hidden in the driver's door, and which focused on the front-seat passenger side window. Wireless audio transmitters were also placed in the automobile.

The police enlisted the assistance of several "special employees" to make drug buys. One of these "special employees" was Patrick Hughes, a known "crack head" who had grown up a short distance from Sursum Corda and who knew some of the dealers in the area. Hughes had a substantial criminal record; he had failed to appear for sentencing for robbery in Virginia; in order to avoid detection of his problems with the law, he used his brother's name in dealing with the police; and he stole some of the crack cocaine and marijuana that he had purchased as part of the investigation.

During Blockbuster, Hughes made 148 videotaped drug buys. He was paid thirty-five to fifty dollars for each such purchase. Towards the end of the investigation, when the police believed that they had purchased drugs from most of the dealers in Sursum Corda, Hughes was paid fifty dollars per day to buy food or pay for housing. Shortly after the completion of the investigation, Hughes was placed in the witness protection program. As a result of his cooperation with the police, Hughes received very lenient punishment for several of his offenses, including probation for the drug thefts and unlawful drug possession during Blockbuster and probation for the Virginia robbery for which he had failed to appear for sentencing. Hughes was not prosecuted at all for failure to appear.

Hughes testified that on December 1, 1999, he purchased two dime bags of crack cocaine from appellant Plummer, whom he claimed to have known for about a year by his alleged nickname, "Goof." Hughes asserted that he had purchased drugs twenty to forty times from Goof before he started

1. These two counts were subsequently dismissed on the motion of the government.

2. The judge also imposed a five-year term of supervised probation and ordered Plummer to pay $100 to the Victim Compensation Fund.

working for the police,[3] and also that he had lived with Goof. The videotape of the transaction was introduced into evidence and played to the jury. After viewing the tape, Investigator Joseph Abdalla, one of the police officers with whom Hughes was working, and several of Abdalla's fellow-officers, went to Sursum Corda to look for the man who had sold drugs to Hughes. The officers spotted Plummer in a nearby park and concluded that he was the seller shown in the videotape. The officers stopped Plummer[4] and asked him for identification, which he provided, but on this occasion they did not arrest or search him. Investigator Abdalla testified that, thereafter, he saw Plummer in the Sursum Corda area about three times a week.[5] Hughes subsequently identified Plummer as the seller at the trial, but no identification procedure was attempted prior to that.

Plummer's principal defense was misidentification. Although he did not testify, he claimed, through counsel, that he was not the man in the videotapes. Two female friends of Plummer, Arga Jackson and LaTonya McCrae, testified, *inter alia*, that Plummer differed from the man in the videotapes in the following respects:

1. Unlike the videotaped seller, Plummer had facial hair for many years, and had worn his hair in cornrows;

2. So far as the witnesses were aware, Plummer did not own a green Eddie Bauer jacket or a wool cap; Hughes had described Plummer as wearing both at the time of at least one of the alleged sales;

3. Plummer had a chipped tooth;

4. Although Plummer had other nicknames, neither witness had heard him called "Goof" (the nickname that Hughes attributed to him);

5. Plummer did not eat sunflower seeds (Hughes reported that the seller had been eating them); and

6. Plummer is near-sighted and usually wears prescription glasses; the police officers had not seen him wear spectacles.[6]

The jury apparently rejected much of the defense testimony, and Plummer was found guilty of one count of distribution. At sentencing, the judge was also unimpressed by the alleged discrepancies; she indicated that Plummer had, in effect, attempted to alter his appearance, and that one of the defense witnesses had lied for him.

## II.

## LEGAL ANALYSIS

*A. Plummer's objection to the trial judge's decision to permit jurors to propose questions to witnesses.*

 Plummer first contends that the trial judge abused her discretion by per-

---

3. There was no objection to this apparent "other crimes" evidence, and no issue has been raised on appeal with respect to it.

4. It appears that the police also stopped at least one other man of approximately the same height and weight.

5. Hughes testified that he again purchased drugs from Plummer on February 18 and April 7, 2000. Because the juries at both of Plummer's trials were unable to reach a unanimous verdict regarding these two alleged sales, and because the government has

dismissed these two charges, we think it unnecessary to describe the testimony relating to them. In her closing argument, however, the prosecutor contended that the government's strongest evidence related to the February 18 sale, and that because the same man was involved in the first and second sales, Plummer must be guilty of the first offense too.

6. Ms. McCrae also attempted to provide Plummer with an alibi defense for December 1, 1999.

mitting jurors to propose questions to witnesses. In *Yeager v. Greene*, 502 A.2d 980 (D.C.1985), this court declined to issue a writ of mandamus against a judge of the Superior Court who was permitting such juror participation. We stated, *inter alia*, that the judge's "policy of allowing jurors to submit written questions to witnesses does not appear to be an abuse of his authority granted by Rule 57 to conduct witness questioning 'in any lawful manner.'" *Id.* at 985. The procedures used by the trial judge in the present case, including her explanation of the process to the jurors, were essentially the same as those used by the judge in *Yeager*, and at least implicitly approved by this court. We perceive no abuse of discretion.

**B.** *Plummer's objection to a question proposed by a juror and posed by the judge to Investigator Abdalla.*

Upon the suggestion of a juror, the judge asked Investigator Abdalla why he approached and stopped Plummer in the park on December 1, 1999. Predictably, given the circumstances, Abdalla testified that "after viewing the videotape of [the] sale, I stopped Mr. Plummer . . . and identified him as the seller." Abdalla added that he "positively identified" the seller on the videotape as Plummer. Plummer invites our attention to the judge's ruling at the first trial that defense witnesses would not be permitted to testify whether they believed the seller in the videotape to be Plummer, and he argues that the juror's question to Abdalla permitted the presentation of evidence supporting the prosecution when the introduction of similar evidence by the defense had been proscribed.

■ In our view, the evidence elicited by the juror's question was admissible to explain why the police stopped Plummer. The defense requested a cautionary instruction. After consulting with counsel, the judge instructed the jurors that although they had heard Abdalla express an opinion on the subject, "you should understand that it's ultimately your determination as the fact-finders as to whether or not the person on the tape is Mr. Plummer."[7] Moreover, on cross-examination *the defense* subsequently elicited from another officer—James Shieder—that he too was "tasked with" watching the videotape of the transaction and with subsequently making an identification.

There is, in our view, a significant difference between permitting Abdalla to testify that his viewing of the videotape enabled him to identify and stop Plummer—an explanation of his actions as a police officer— and allowing defense witnesses to testify simply that they have examined the videotapes and that in their opinion Plummer is not the seller shown on them. *Cf. Sanders v. United States*, 809 A.2d 584, 596 (D.C. 2002); *cert. denied*, 538 U.S. 937, 123 S.Ct. 1602, 155 L.Ed.2d 340 (2003) (approving, under some circumstances, the admission of such testimony). But even assuming, *arguendo*, that the two situations are legally indistinguishable, the defense never asked the judge, after Abdalla had been permitted to testify as described above, to reconsider her ruling at the first trial, in which she had excluded proposed defense witness testimony that Plummer was not the seller who appeared in the videotapes. *Cf. Thorne v. United States*, 582 A.2d 964, 965–66 (D.C.1990). Moreover, the testimo-

7. Perhaps a more appropriate instruction would have been to inform the jurors that they could consider this testimony by Abdalla solely for the purpose of showing why Plummer was stopped, and that they were not permitted to consider the testimony on the question whether the man in the videotape was Plummer. There was, however, no objection to the cautionary instruction as given.

ny that the two defense witnesses *were* permitted to present regarding Plummer's hairstyle, clothing, and other features made it plain that, in the opinion of these witnesses, the seller in the videotapes could not have been Plummer.

The predictable and actual effect of the judge's rulings was to permit the jury to hear a police officer's view as to the identity of the man in the December 1, 1999 videotape, but to exclude the testimony of defense witnesses on this subject. It might therefore have been a wiser exercise of discretion to decline to pose the juror's proposed question to Abdalla. Nevertheless, we discern no abuse of discretion (or basis for reversal) in the judge's ruling on this point.

C. *Plummer's contention that the judge improperly asked and followed up a juror-proposed question to Ms. McCrae regarding Plummer's employment.*

A juror proposed that the judge ask defense witness LaTonya McCrae, a close friend of Plummer who had lived in the same household with him during the relevant period, whether she knew if Plummer was employed at the time she lived with him, and if so, where he was employed. The defense objected to the question as irrelevant. The judge noted that when Plummer was introduced to the jury, he said that he worked at the CVS pharmacy on Dupont Circle, which is not near Sursum Corda. The judge ruled that the juror's proposed question "goes to why he was in Sursum Corda every day in addition to the fact that he had friends and family there," and she posed to Ms. McCrae the question suggested by the juror. The witness testified that Plummer did "volunteer work when I was staying with him." She stated that Plummer's volunteer work was

performed at Concerned Citizens on Martin Luther King Avenue, that there were no set times of the day, that he did not go to Concerned Citizens on December 1, 1999,[8] but that she believed he did go there on February 18, 2000.

Plummer's attorney expressed apprehension at the bench that the questioning would reveal that Plummer was doing court-ordered community service (which, in fact, he was) and that the jurors would therefore learn that Plummer had a criminal record. The judge told the attorneys at sidebar that she found it incredible that the witness would claim to know whether Plummer went to Concerned Citizens on February 18, eighteen months before the trial. The judge stated, however,

> THE COURT: I'm not going to ask her why he goes there. But—and I mean I'm not going to treat her like she's some adverse witness to the Court, but her answers have to make some sense.
>
> And we have another question while you're all up here. "What program was Mr. Plummer in?" Here we go.
>
> THE COURT: That question we won't be asking.

The judge thus made it clear that she did not want Plummer's prior criminal record to be revealed to the jury. The judge asked a few more questions regarding Plummer's schedule at Concerned Citizens, and she then released the witness and proceeded with the trial.

█ In his brief, counsel for Plummer claims that the judge "renewed her assault on [Ms.] McCrae's credibility, and by extension, [on] Plummer's right to a fair trial by an impartial jury." Although, as we have noted, the judge did state, outside the presence of the jury, that she had doubts

---

8. Ms. McCrae had testified that she was with Plummer for a substantial part of the day on

December 1, 1999.

about the witness' credibility, we are inclined to agree with the government that "[n]othing on the face of these questions suggests that the trial court was skeptical of Ms. McCrae or sought to discredit her testimony." It is, of course, possible that one or more jurors speculated that Plummer could have been doing community service. Given the marginal relevance of the questions regarding Plummer's employment, and the possibility that the judge's doubts about the witness' credibility may have been inadvertently communicated to the jury, it might have been better if the juror's question had not been asked and if the judge had not followed it up. We cannot say, however, that the judge abused her discretion by making the choice that she did, and by asking the question and following it up, for we regard the point as a comparatively close call.

D. *Plummer's contention that the judge improperly asked and followed up a juror-proposed question to Ms. McCrae regarding her own employment.*

Ms. McCrae testified that Plummer was with her on December 1, 1999, at the time the first videotaped sale to Hughes was made. She also stated that she worked and attended school. She was extensively cross-examined as to how she recalled what occurred on December 1, 1999, over a year and a half before the trial. After the attorneys had completed their examination of the witness, jurors proposed several additional questions to be posed to her. The last of these proposed juror questions was: "If December the 1st [was a] Wednesday, why weren't you in school that morning?" Although Plummer's attorney had previously requested the judge not to

permit further juror questioning, no party objected to this specific question.[9] The following interrogation by the court ensued:

Q. Ma'am, if December the 1st, 1999, was a Wednesday, why weren't you in school that morning?

A. I didn't attend school that day.

Q. I'm sorry?

A. I didn't attend school that day.

Q. No. That's not the question. Why were you not in school that morning?

A. I decided not to go that morning.

Q. Was it for a specific reason that you decided not to go?

A. No.

Q. Do you often just arbitrarily not go to classes?

A. No.

Q. This was the one time that you ever arbitrarily decided not to go to school?

A. No, this isn't the only time. That's not the only time.

The last two of the questions quoted above would, in our view, have better been left unasked. In her instructions regarding the questioning of witnesses, the judge directed the jurors to "only ask the question to get information. Don't try to discredit a witness' testimony or quarrel with the witness." At least the two final questions, which included the repetition of the adverb "arbitrarily," come across to us as resembling a cross-examination, skeptical in approach, and as casting doubt on the witness' veracity. There was no objection, however, and although we view the judge's posing and phrasing of these questions as unfortunate, we discern no plain error[10] or other basis for reversal.[11]

9. The prosecutor stated that she did not object. Plummer's attorney said nothing and acquiesced by his silence.

10. We recognize that it might have been difficult for defense counsel to object to a juror-posed question by the court, but a tactful observation at the bench that the judge's ap-

E. *Plummer's claim of judicial bias at sentencing.*

During Plummer's sentencing hearing, the judge stated, *inter alia:*

> Well, Mr. Plummer had a—other chances at probation, other—another period of incarceration and—that made no impression on Mr. Plummer, and he certainly to me doesn't appear to have taken responsibility for his actions here.
>
> I mean, Mr. Plummer had his friend sit on the stand and lie for him. Mr. Plummer wore glasses and his friends would come in and smirk and smile at him because he was wearing his disguise for the jury. I don't think Mr. Plummer has respect or regard for the judicial system.

Defense counsel represented that the glasses that Plummer was wearing were prescription glasses and that they were issued at the jail after Plummer took an eye test. Plummer claimed that the glasses that he previously wore were broken. The judge asked, rhetorically and somewhat sarcastically: "He just doesn't wear them when he deals? Is that it?" The judge then imposed a sentence of ten to thirty years, but suspended execution of all but five years and added a five-year term of probation.

▉▉▉ Plummer claims that "a sentence of ten to thirty years in prison for selling three $20 bags of crack cocaine was excessive,"[12] and that the suspension of half of

the term is "irrelevant." This contention is without merit. "The power to affix the penalty upon conviction is vested exclusively in the trial court, and the appellate court is vested with no jurisdiction in respect of that power, provided [the penalty] does not exceed the statutory limit." *In re L.J.,* 546 A.2d 429, 434 (D.C.1988) (quoting *Raymond v. United States,* 26 App. D.C. 250, 257 (1905), *cert. denied,* 200 U.S. 619, 26 S.Ct. 755, 50 L.Ed. 623 (1906)); *see also Walden v. United States,* 366 A.2d 1075, 1076 (D.C.1976). Indeed, until fairly recently, the non-suspended portion of Plummer's jail term would not have been much longer than the mandatory minimum for a first offense. *See Holiday v. United States,* 683 A.2d 61, 82 (D.C.1996). Moreover, Plummer had a substantial criminal record, and Hughes testified that even before Operation Blockbuster, Plummer had sold him crack cocaine *twenty to forty times.* In determining what sentence to impose, the trial judge "may appropriately conduct an inquiry, broad in scope, largely unlimited 'either as to kind of information he may consider, or the source from which it came.'" *United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); *see Harris v. United States,* 612 A.2d 198, 208 (D.C.1992) (quoting *Tucker*); *see, generally, Williams v. New York,* 337 U.S. 241, 251, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). The sentence imposed in this case did not reflect judicial bias, nor could it

---

proach could be misinterpreted by the jurors might well have caused the judge to reassure the jurors that the judge was not trying to influence their decision. *See, generally, Belton v. United States,* 581 A.2d 1205, 1212 & n. 7 (D.C.1990); *id.* at 1216–18 (dissenting opinion). Moreover, the judge instructed the jury at the outset of the case that "during trial, you shouldn't take anything that I say or do as indicating how I would decide the case because I don't decide the case, you decide the case."

**11.** Although we have found some cause for concern with respect to the judge's actions discussed in Parts II.B., II.C. and II.D., *supra,* we conclude that, individually or cumulatively, they do not constitute reversible error.

**12.** Hughes testified that on December 1, 1999, Plummer sold him two $10 rocks of crack cocaine.

reasonably be described as excessive.[13]

The judge's remark that "Mr. Plummer had his friend sit on the stand and lie for him" is more troublesome. Without going into detail with respect to the background of her comment, we think that although it is possible that the assertion by the judge is correct, it is not at all obvious to us that the record fully supports a statement as categorical, positive, and accusatory as the trial judge made. It does appear, however, that the defense witnesses' testimony that Plummer regularly wore glasses was disbelieved by the jury as well as by the judge. The judge's comment was plainly based on what she believed the facts to be, and Plummer does not contend otherwise.[14] Moreover, the judge's remarks were made after the trial itself, as distinguished from the sentencing, was over.

F. *Plummer's claim of judicial bias.*

Plummer asserts that in handling the issues discussed above, as well as on an instructional issue, see note 15, *infra,* the trial judge exhibited bias against Plummer "which was real, [and] not merely perceived by the jury." Fundamentally, Plummer appears to claim that the judge intentionally deprived him of a fair trial. We do not agree.

■ Plummer made no claim of judicial bias in the trial court, either after the first trial or during the second. Indeed, the record reflects a large measure of cordiality between the court and counsel. All but one of the instances of alleged bias occurred before Plummer was sentenced, and no claim of bias was asserted at sentencing. Our review is therefore for "plain error." *In re J.A.,* 601 A.2d 69, 75 (D.C. 1991).

■ In all but the most extreme cases, rulings during courtroom proceedings do not constitute evidence of judicial bias. *Id.* at 76. Generally, as we explained in *Browner v. District of Columbia,* 549 A.2d 1107, 1113–14 (D.C.1988), "[l]egal rulings against appellants, of course, do not constitute grounds for recusal, for any prejudice must stem from an extrajudicial source." (Citation omitted.) It is true that we have expressed reservations in this opinion regarding some of the judge's rulings and comments, but there is no evidence at all of bias from an extrajudicial source. Although a showing that a judge's alleged prejudice comes from an extrajudicial source may not be required when the circumstances are so extreme that "a judge's bias appears to have become overpowering," *Whitaker v. McLean,* 73 App.D.C. 259, 118 F.2d 596 (1941) (per curiam), Plummer has not satisfied this most exacting standard.

## III.

## CONCLUSION

For the foregoing reasons, Plummer's conviction is

*Affirmed.*[15]

---

13. Plummer offers no explanation why the suspension of five years of a ten-year term is "irrelevant" to his thesis.

14. At the first trial, the jury asked to examine Plummer's glasses "to see if they are real." The defense and the prosecution both objected. The judge may have believed, not unreasonably, that if Plummer was in fact wearing prescription glasses, he would have wanted the jurors to see them, so that the jurors would reject any notion that he was pretending to be near-sighted in order to disguise his appearance.

15. Substantially for the reasons stated by the government in its brief, the trial judge did not commit reversible error in declining to give

certain language in Redbook Instruction 2.24,

known as the "Informer's Instruction."