Joseph Desmond KALIKU and David
Matthews, Appellants,

v.

UNITED STATES, Appellee.

Nos. 07–CF–486, 07–CF–557.

District of Columbia Court of Appeals.

Argued April 1, 2009.
Decided May 13, 2010.

766

Joanne Vasco, Hyattsville, MD, appointed by the court, for appellant Joseph Desmond Kaliku.

Thomas T. Heslep, Washington, DC, appointed by the court, for appellant David Matthews.

John P. Gidez, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time, and Roy W. McLeese III, Florence Pan, and Deborah L. Connor, Assistant United States Attorneys, were on the brief for appellee.

Before REID, GLICKMAN, and OBERLY, Associate Judges.

REID, Associate Judge:

Appellants Joseph Desmond Kaliku and David Matthews were jointly charged in a twenty-five count indictment. Following a jury trial, Mr. Kaliku was convicted of assault with a dangerous weapon ("ADW"),[1] armed robbery,[2] possession of a firearm during a crime of violence ("PFCV"),[3] first-degree sexual abuse while armed (with aggravating circumstances),[4] and kidnapping while armed.[5] The jury found Mr. Matthews guilty of ADW, armed robbery, kidnapping while armed, first-degree sexual abuse (with aggravating circumstances), PFCV, and threaten-

---

**1.** D.C.Code § 22–402 (2001).

**2.** D.C.Code §§ 22–2801, –4502.

**3.** D.C.Code § 22–4504(b).

**4.** D.C.Code §§ 22–3002(a)(1) and (2), –4502, and –3020(a)(4) and (6).

**5.** D.C.Code §§ 22–2001, –4502.

ing to injure and kidnap ("threats").[6] Both men raise several constitutional, evidentiary and other challenges to their convictions. Discerning neither reversible error nor abuse of discretion requiring reversal, we affirm the judgments of the trial court.

## FACTUAL SUMMARY

The government presented evidence showing that on April 30, 2006, at approximately 3:00 a.m., Jaundell Jones picked up Kimberly Hill, a prostitute, in the Northeast quadrant of the District of Columbia. They agreed that Mr. Jones would pay Ms. Hill $30 or $35 to perform a sex act. Mr. Jones parked on a residential street and paid Ms. Hill. As they were preparing for the sex act, a man wearing a black sweater with a stripe of red on the sleeve, later identified as Mr. Kaliku, opened the front door, placed a gun in Mr. Jones's face, and demanded his money. Mr. Jones gave Mr. Kaliku the money and, in response to Mr. Kaliku's command, moved to the backseat.

A few seconds later, another man wearing a black mask and an all-black coat, subsequently identified as Mr. Matthews, opened the back passenger side door, entered the vehicle, and pointed a gun at Mr. Jones's face. Mr. Matthews ordered Mr. Jones to the floor of the vehicle, but Mr. Jones opened the back driver side door and fled. He ran up the street to the Metropolitan Police Department's ("MPD") Fifth District station to report the robbery.

After Mr. Jones fled the scene, Mr. Kaliku demanded Ms. Hill's money; she said the money was in her purse in the back seat of the car. Ms. Hill heard shuffling in the back seat, as though Mr. Matthews was going through her purse.[7] Mr. Kaliku and Mr. Matthews exited the car, and Ms. Hill turned to look in the back seat to see if she could retrieve her purse, but Mr. Matthews opened the front passenger side door, grabbed her arm, placed something hard against her side, and told her to "come, you do what I say, and you don't get dead."

Mr. Matthews walked Ms. Hill across the street to an alley between two houses, next to a brick wall. Ms. Hill exclaimed, "I'll do what you want me to. Please don't hurt me. Please don't kill me." Mr. Kaliku soon joined Ms. Hill and Mr. Matthews in the alley, and announced that he "want[ed] to f* *k." Mr. Matthews asked Mr. Kaliku for a condom, and Mr. Kaliku handed him a green, mint-flavored condom. Mr. Kaliku lifted his shirt, took out a gun, put it in the grass near the brick wall, and put on the condom, with Ms. Hill's assistance. Ms. Hill performed the sex act on Mr. Kaliku, while Mr. Matthews inserted himself into her "vaginal area from the rear." The men switched positions twice as they continued their sexual abuse of Ms. Hill. After they had finished with Ms. Hill, Mr. Kaliku retrieved his gun and both men left the area.[8]

As Mr. Jones and a police officer were walking toward the place where Mr. Jones had parked his car, they encountered Ms. Hill.[9] When all three stopped, they heard

6. D.C.Code § 22–1810.

7. Ms. Hill later discovered that she was missing her purse and two cellular phones.

8. At some point during the course of events, Ms. Hill gave one of the men her street name and her cellular phone number because it was "part of [her] nature of keeping everything

calm." She did not want to give the man a false phone number because she was "not a natural liar" and did not want to forget the false phone number if the man asked her for it a second time.

9. Mr. Jones did not tell the police officers that he had left Ms. Hill back in the car because

noise that sounded like gun shots. Police officers began running toward the area where Ms. Hill had last seen Mr. Kaliku and Mr. Matthews. Another police officer arrived in a squad car and drove Ms. Hill and Mr. Jones back to the Fifth District police station.[10] Shortly thereafter, Ms. Hill attempted to leave the police station in order to avoid being involved in the robbery investigation and to return to Mr. Jones's car to collect her belongings. However, an officer took her and Mr. Jones to another location for a show-up identification.

MPD Sergeant John Haines testified that he was at the Fifth District police station when he heard a radio report about a robbery that had taken place near the station; the report described two armed black male suspects dressed in black clothing and wearing black hooded sweatshirts, one of which was black and red. He assisted in the search for the suspects. While he was in the alley in the 1800 block of 24th Street, Northeast, he saw a man dressed in dark clothing and a hooded sweatshirt coming out of the rear yard of one of the homes. When the man saw Sergeant Haines, he ran. Subsequently a second, taller man emerged from the same area, dressed in dark clothing and a hooded sweatshirt with the hood over his head. When he noticed Sergeant Haines, he turned and walked in the opposite direction. Sergeant Haines quickened his pace to catch up with the second man, who walked faster, and dipped down. The second man appeared to throw something underneath a Ford Expedition, after which he began to run. Sergeant Haines briefly lost sight of both suspects, and he initiated a broadcast for them.

Sergeant Haines looked under the Ford Expedition and observed "what appeared to be a semiautomatic handgun." He noticed movement near a parked vehicle. Soon, Sergeant Haines and another officer observed two men sitting in a car. Sergeant Haines asked the driver, later identified as Mr. Matthews, and the passenger, later identified as Mr. Kaliku, to exit the vehicle. Mr. Kaliku was wearing a black hooded sweatshirt with red stripes on the sleeve. The officers detained both individuals.

Sergeant Haines arranged a show-up identification procedure for Ms. Hill and Mr. Jones. Although Ms. Hill and Mr. Jones initially arrived in one police car, Sergeant Haines instructed the officers to place the two witnesses in separate vehicles, and then he explained the show-up identification process to each witness. The officers drove to a point in the alley, about four car lengths from the individuals in custody, and turned on their lights. Ms. Hill was the first witness taken to identify the individuals; however, because she did not have her glasses, she was unable to make any identification at that time. When his turn came, Mr. Jones identified both Mr. Kaliku and Mr. Matthews as the perpetrators. After the police transported Ms. Hill to retrieve her glasses, she positively identified both men. As a result of the identifications, Mr. Kaliku and Mr. Matthews were arrested.

About seven hours after the arrest of both men, at approximately 10:20 a.m., MPD Officer Leother Strong, the crime scene technician, collected penile swabs

he was "ashamed," "embarrassed and scared."

10. Ms. Hill did not initially tell the police about the sexual assault because she didn't believe she had been assaulted "until someone had actually explained to [her that] what happened . . . was a form of assault."

from them.[11] In addition, Officer Strong took photographs of items as he found them at the crime scene (in the car where defendants were seated and on the ground near the car, between houses, and from the person of both defendants), and he identified the items at trial that he had retrieved from the crime scene: (1) lip gloss; (2) a leather ID holder; (3) a green latex condom; (4) four condom wrappers; (5) a BB gun; (6) two cell phones; (7) a cell phone holder; (8) a black sweat hooded jacket, and (9) a black ski mask. Officer Strong also obtained a buccal swab from Ms. Hill, and sent all of the evidence to the FBI forensic laboratory for testing.

Jennifer Luttman, a government witness and an FBI forensic DNA examiner for ten years, testified that she generally supervises a team of biologists, as in this case, by "determin[ing] which items of evidence will be worked, what exams will be done, which stains will be tested for DNA." In addition, Ms. Luttman's duties required her to "interpret all the results, draw the conclusions, write the report, and then testify as needed." At the time of trial, she had "managed over 800 cases." She was assigned to manage the evidence in this case, "did the comparisons between the items of evidence," prepared "the conclusions," and "wrote the report." She explained the process that was followed in the laboratory upon receipt of evidence. For example, with respect to the penile swab provided by Mr. Matthews, "[t]he biologist did the DNA testing," and Ms. Luttman "did the interpretation."[12] She found DNA from Ms. Hill and Mr. Matthews on the condom; the DNA from Mr. Matthews matched the DNA of the major

contributor with respect to the condom. She also discovered DNA from Ms. Hill on the penile swabs from Mr. Kaliku and Mr. Matthews, and she determined that Ms. Hill could not be excluded as a potential source of the DNA found on Mr. Kaliku's and Mr. Matthews's boxer shorts. She conducted and discussed her "statistical calculation to determine the random match probabilities." She stated, for example, that "the probability of selecting an unrelated individual at random that would have the same DNA profile as the DNA from the major contributor (Mr. Matthews) that was found on [one of] the penile swab[s]," "is approximately 1 in 1.3 million from the African–American population, 1 in 4.8 million from the Caucasian population, 1 in 4.6 million from the Southeastern Hispanic population, and 1 in 2.3 million from the Southwestern Hispanic population." Her testimony clearly tied each man to Ms. Hill's DNA.

Harold Deadman, a fiber-comparison analysis expert for MPD who previously worked for twenty-five years at the FBI, explained the process for textile fiber examinations. According to his testimony, the fibers from the sweatshirt and mask recovered at the crime scene matched fibers on Mr. Kaliku's and Mr. Matthews's clothing.

As his defense, Mr. Kaliku attempted to show, through the testimony of MPD Officer William Rapp, that there was another man on the scene who wore dark clothing and who was seen running in the area of 24th Street, Northeast. Mr. Kaliku denied robbing the victims. Mr. Matthews testi-

---

**11.** Each man obtained his own penile swab sample in accordance with Officer Strong's instructions.

**12.** In addition to Ms. Luttman, the team consisted of Shelley Crispin, who "was doing the serology"; Candace Larry who collected the

DNA from the underwear and put the swab in a tube without adding any chemicals; and Alice Brown who performed "the extraction and the amplification," that is, the "actual DNA bench work or wet chemistry."

fied in his own behalf. He maintained that he and Mr. Kaliku had had consensual sex with Ms. Hill, and he denied that they had robbed her and Mr. Jones.

## ANALYSIS

### The DNA Testing/Confrontation Clause Issue

■ Mr. Matthews argues, and Mr. Kaliku adopts the argument, that the admission of the DNA evidence through Ms. Luttman's testimony alone, and without presentation of the three FBI laboratory technicians who actually performed the DNA testing and other work, violated the Sixth Amendment right to confront witnesses. Both men maintain that the trial court's admission of the DNA evidence was not harmless beyond a reasonable doubt because it was "by far the most damning of the trial," and its admission thereby constitutes reversible error. The government contends that, assuming *arguendo* that the trial court admitted the DNA results as substantive evidence in violation of the Sixth Amendment Confrontation Clause, "the error does not require reversal under any standard of review," whether plain error for Mr. Matthews (who did not raise the issue at trial) or harmless constitutional error for Mr. Kaliku (who objected in the trial court and preserved the issue).[13]

■ Where an appellant preserves a Confrontation Clause issue by making an objection at trial, we apply the constitutional harmless error standard of review.

*See Duvall v. United States,* 975 A.2d 839, 843 (D.C.2009) (citing *Callaham v. United States,* 937 A.2d 141, 146 (D.C.2007)). "Under the heightened constitutional standard of review, the government bears the burden of demonstrating that the constitutional error was 'harmless beyond a reasonable doubt,' meaning that the verdict was 'surely unattributable' to the erroneously admitted evidence." *Id.* (quoting *Fields v. United States,* 952 A.2d 859, 866 (D.C.2008)). " '[I]f a statement is improperly admitted, we will reverse where we find a reasonable possibility that the statement contributed to the defendant's conviction.' " *Id.* (quoting *Callaham, supra,* 937 A.2d at 147). If an appellant fails to make a Confrontation Clause objection either before or during trial, we apply the plain error standard of review, *Callaham, supra,* 937 A.2d at 145, which "requires an appellant to show (1) that there was error; (2) that was plain, clear, or obvious; (3) that affected the [appellant's] substantial rights; and (4) that the error seriously affected the fairness, integrity or public reputation of the proceedings." *Id.* (citing *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

■ The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. "A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant

13. The trial court viewed this case as distinguishable from *Thomas v. United States,* 914 A.2d 1 (D.C.2006), where we declared that the trial court's admission of a DEA-7 chemist's report violated appellant's Confrontation Clause right because the government did not make the chemist available for cross-examination. The trial court did not believe that *Thomas* was applicable "in this case where the person that was doing the opining is the individual who did the interpretation of the analysis...." Therefore, said the trial court, appellants' "constitutional rights were complied with [because] they had a right to confront the very ... person who created the opinion." Although that opinion was "based on, obviously, work that she did with other folks ..., [Ms. Luttman] ultimately was the one giving the testimony and the opinion and the conclusions on the DNA results."

had a prior opportunity for cross examination." *Melendez–Diaz v. Massachusetts*, —— U.S. ——, ——, 129 S.Ct. 2527, 2531, 174 L.Ed.2d 314 (2009) (citing *Crawford v. Washington*, 541 U.S. 36, 54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). Moreover, "[w]hether or not they qualify as business or official records, the analysts' statements . . .—prepared specifically for use at petitioner's trial—were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment." *Id.* at 2540.[14] In *Roberts v. United States*, 916 A.2d 922, 938 (D.C.2007), a case involving DNA testing, we said: "To the extent that [the] conclusions of [FBI laboratory scientists] were used as substantive evidence against appellant at trial, he was . . . entitled to be 'confronted with' the conclusions in the manner the Sixth Amendment requires, that is, through the opportunity for cross-examination of the declarant." *Id.* at 938.

Here, the team approach used for the FBI's DNA analysis was similar to that described in *Roberts*, 916 A.2d at 937, and in *Veney v. United States*, 936 A.2d 811 (D.C.2007). We stated in *Veney* that the DNA expert (Ms. Luttman) "made references to the serology tests and the data produced by operation of a DNA-typing instrument, both carried out by other scientists on the team that she managed, which indicated that the DNA in semen stains found on . . . clothing matched appellant's DNA." *Id.* Consequently, "[t]hese test results . . . arguably were offered as substantive evidence." *Id.* The government references this language from *Veney* but does not address the Confrontation Clause issue on its merits. Rather, the government assumes that the DNA Testing/Confrontation Clause issue may be

resolved on the basis of plain error and harmless error. We agree.

Thus, even assuming, without deciding, that the Sixth Amendment Confrontation Clause rights of Mr. Kaliku and Mr. Matthews were violated by the government's failure to produce for cross-examination the member of the FBI team who did the actual DNA testing and the other two members of the team that Ms. Luttman supervised, and for the reasons that follow, we are persuaded that the assumed error was harmless beyond a reasonable doubt in Mr. Kaliku's case, and that it did not constitute plain error in Mr. Matthew's case. From opening to closing statements both men conceded that they engaged in sexual acts with Ms. Hill; they maintained that those sexual acts were consensual. Mr. Kaliku's attorney asserted in his opening statement: "[T]he evidence in this case is going to be that there was sexual activity between [Mr.] Kaliku . . . and Ms. Hill, and that the sexual activity was consensual, completely consensual." Counsel referenced the DNA from Mr. Kaliku's penile swab and admitted that "[Ms. Hill's] DNA is on there," and "[t]he evidence is going to be that that supports and reflects the consensual sex that happened." Mr. Matthews's counsel stated that the events "happened on April 30th, 2006, when Ms. Hill was involved in consensual, consensual, intercourse with my client. No dispute about that." During his closing argument, counsel for Mr. Kaliku acknowledged that his client had admitted what Ms. Luttman's testimony demonstrated:

> Ms. Luttman confirms exactly what Mr. Matthews told you [during his testimony]. There was sex not only [between] Mr. Matthews and Ms. Hill but between Mr. Kaliku and Ms. Hill. I

14. As we noted in *Duvall, supra,* "the Supreme Court 'did not reach' the question whether the error in admitting the forensic analyst certificates was harmless." 975 A.2d at 844 n. 5.

adopt everything Ms. Luttman says.... [T]he irrefutable science[ ] basically says they had consensual sex. That's what the evidence is about.

Counsel for Mr. Matthews also admitted during closing argument that his client engaged in sexual acts with Ms. Hill: "In the beginning of the case, I indicated that David Matthews was involved in consensual sex with Kimberly Hill." Counsel proceeded to recount Mr. Matthews's testimony detailing his encounter with Ms. Hill, and he concluded that Mr. Matthews "met his burden to show ... consent ... by ... taking the stand and indicating that he was engaged in sexual contact with Ms. Hill consensually." [15] The references to consensual sex during Mr. Kaliku's and Mr. Matthews's opening and closing arguments were tantamount to, or indeed constituted, evidentiary admissions. *See United States v. Blood,* 806 F.2d 1218, 1221 (4th Cir.1986) ("a clear and unambiguous admission of fact made by a party's attorney in an opening statement in a ... criminal case is binding upon the party") (citations omitted); *see also Harris v. United States,* 834 A.2d 106, 118, 120 (D.C. 2003) ("in certain circumstances, statements of [government counsel] are party admissions that are admissible against the government in subsequent criminal cases"; "prior statements of an Assistant United States Attorney can be treated as party admissions").

Furthermore, other evidence clearly tied appellants to the sexual abuse of Ms. Hill, including her testimony, Mr. Deadman's fiber-comparison analysis, Officer Strong's recovery of items from the crime scene (including the green latex condom and condom wrappers), and Sergeant Haines's testimony regarding the sighting and apprehension of appellants near the place where Ms. Hill was sexually assaulted. In short, based on our review of the record we are persuaded that, even assuming, without deciding, that the Sixth Amendment Confrontation Clause rights of Mr. Kaliku and Mr. Matthews were violated by the government's failure to produce for cross-examination the member of the FBI team who did the actual DNA testing, as well as the other two members of the team that Ms. Luttman supervised, we conclude, in Mr. Kaliku's case, that the government has satisfied its burden of proving that the error was harmless beyond a reasonable doubt. In addition, we are satisfied that, as in *Veney,* Mr. Matthews could not meet the fourth prong of the plain error standard by showing "that the error seriously affected the fairness, integrity or public reputation of the proceedings." *Callaham, supra,* 937 A.2d at 145. What we said in *Veney* applies here: the DNA expert's opinions "were based on her independent analysis of DNA test results and her own application of statistical standards. [She] was cross-examined extensively about her interpretation of the data." 936 A.2d at 831.

### The Preservation of DNA Evidence Issue

██ Mr. Matthews contends that because Ms. Luttman "had used up each [penile] swab sample in the testing, without consulting the United States Attorney in the case," and without giving the defense an opportunity to ask for "a portion of the sample for testing," the trial court improperly failed to suppress the DNA analysis of the penile swabs.[16] In addition, he asserts that because the discovery of DNA from at least three individuals was

---

**15.** Mr. Matthews testified at trial and described his version of the events that included his sexual acts with Ms. Hill.

**16.** Mr. Kaliku adopts the facts and arguments put forth by Mr. Matthews regarding the preservation issue.

"difficult to reconcile with the testimony that condoms were used at all times," and because the penile swab test results were "markedly different from [the results] obtained from [testing] Mr. Matthews's underwear," "further defense testing would [not] have been futile." In response, the government argues that Mr. Kaliku and Mr. Matthews have not met their burden to demonstrate a due process violation for lost or destroyed evidence. Furthermore, the government asserts, there is no evidence that the FBI laboratory technicians acted in bad faith when they tested the penile swab samples, or that "preserving a portion of the penile swab would have led to the discovery of anything of exculpatory value."

After a pretrial hearing on the preservation issue, the trial court determined that Ms. Luttman was a credible witness and that FBI laboratory technicians did not act "with any bad will or intent against the [appellants] in consuming the swabs." Although Ms. Luttman made a mistake in "not contacting the government" before she decided to use the entire sample, "that mistake [did not] rise[ ] to the level of negligence, especially of gross negligence." Moreover, Ms. Luttman's "notes and procedures . . . were preserved for review by the defense . . . to determine whether or not there was anything done improperly . . . that would somehow invalidate the results of the test." Finally, despite the use of alternative testing protocols in other labs, the technicians in this lab were "following what was their standard FBI protocol."

▮▮▮ Our analysis is guided by the following legal principles. "Any decision to impose sanctions for the loss or destruction of evidence is within the discretion of the trial court." *Rodriguez v. United States,* 915 A.2d 380, 389 (D.C.2007) (citing *Davis v. United States,* 641 A.2d 484, 494

(D.C.1994)). "[B]oth the decision to impose a sanction and the choice of a sanction" fall within that discretion. *Martinez v. United States,* 762 A.2d 931, 935 (D.C. 2000). When "determining what sanction, if any, to impose, 'the court should weigh [1] the degree of negligence or bad faith involved, [2] the importance of the evidence lost, and [3] the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice.'" *Rodriguez, supra,* 915 A.2d at 389 (quoting *Montgomery v. United States,* 384 A.2d 655, 662 (D.C.1978)).

▮▮▮ However, "[t]he burden is on [appellants] to show both that there was bad faith on the part of the government and that [the retest results from the penile swab samples were] not only material . . . but also potentially exculpatory." *Martinez, supra,* 762 A.2d at 935. While any "deliberate destruction of discoverable evidence designed to hinder preparation of the defense case will be weighed heavily against the government and will generally result in full sanctions[,] . . . if there has been a good faith loss, the [trial] court may excuse it and refuse to apply sanctions." *Rodriguez, supra,* 915 A.2d at 389 (citation and internal quotation marks omitted). Under that criterion, this court "will reverse only where we find abuse of discretion coupled with substantial prejudice to appellant[s'] rights." *Davis, supra,* 641 A.2d at 494 (citations omitted).

▮▮▮ Our review of the record constrains us to conclude that Mr. Kaliku and Mr. Matthews have not demonstrated bad faith on the part of the government in using the entire penile swab samples; nor have they demonstrated substantial prejudice due to the absence of samples for retesting. Ms. Luttman testified that one-fourth of the swab was consumed in order to test for the presence of each appellant's semen, and the need to test "for DNA

foreign to the person" who provided the swab meant that, "in most situations, ... the sample had to be consumed in order to get reliable results." Given Ms. Luttman's testimony and explanation, which the trial court credited, the court's conclusion is substantiated—that the FBI laboratory technicians acted in good-faith to obtain scientifically reliable data, not to engage in the "deliberate destruction of discoverable evidence" or to "hinder preparation of the defense case." Moreover, there is no hint in the record that Messers. Matthews and Kaliku were substantially prejudiced because retesting likely would have produced exculpatory evidence,[17] or would have provided any support for their assertion that they did not coerce Ms. Hill into having sex with them. As we noted in *Williams v. United States*: "Where the exculpatory effect of the evidence is unknown, the destruction of evidence by the government [or, as here, the total consumption of a sample] violates a defendant's due process rights only when the government acted in bad faith, leading to an inference that the evidence was potentially exculpatory." 881 A.2d 557, 565 n. 8 (citing *Arizona v. Youngblood*, 488 U.S. 51, 57–58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)).[18] In short, appellants cannot prevail on their due process argument.

## The Fourth Amendment Suppression Issue

Because the police obtained the penile swabs as a result of a search conducted without a warrant or court order, allegedly in violation of appellants' Fourth Amendment rights, Messers. Kaliku and Matthews contend that the trial court's failure to suppress the DNA results from the penile swabs constituted reversible error.[19] They also argue that the

17. Mr. Matthews and Mr. Kaliku claimed that they had consensual sex with Ms. Hill; hence, their arguments concerning the presence of DNA despite the use of condoms and the different results from testing of Mr. Matthews's underwear, do not translate into the likely presence of exculpatory evidence, or evidence showing that they had no sexual contact with Ms. Hill.

18. Messers. Kaliku and Matthews attempt to place themselves within the ambit of the Innocence Protection Act ("IPA"), D.C.Code §§ 22–4131 *et seq.* by referencing § 22–4132 and declaring that "the [IPA] ... gives the defendant the right to request testing of relevant biological material, when there is sufficient material 'to conduct another DNA test.'" They add, "[h]ere, there was enough for another test, until the analyst decided to use it all." Section 22–4132 is a notice provision relating to "pre-conviction DNA testing," which specifies the information about which a defendant must be informed in open court prior to trial; it gives a defendant "a right to request [DNA] testing" prior to trial, but does not "provide[] an 'absolute right' to independent DNA testing." *Veney, supra*, 936 A.2d at 823 n. 14. The IPA's substantive provisions focus on the wrongly convicted, the person who is "actually innocent," that is, "the person [who] did not commit the crime of which he or she was convicted." D.C.Code § 22–4131(1). As we reiterated in *Veney*, "[l]egislative history reveals that the impetus for the IPA was concern over a perceived 'gap in judicial remedies available to convicted persons who secure evidence of actual innocence ... after their convictions....'" *Veney, supra*, 936 A.2d at 823 n. 14 (quoting *Bouknight v. United States*, 867 A.2d 245, 251 (D.C. 2005)). Moreover, the IPA has a preservation of evidence provision which contains a bad faith standard. As we have indicated, nothing in this record reveals any act of bad faith on the part of Ms. Luttman or her team. In short, appellants' mention, in cursory fashion, of the notification provisions of the IPA is an insufficient basis for reversing their convictions on the ground that the government consumed all of the penile swab samples.

19. Mr. Kaliku adopts the facts and arguments put forth by Mr. Matthews regarding suppression of the DNA evidence. In light of our conclusion concerning this issue, we see no need to discuss whether Mr. Matthews waived this issue because he did not file a motion to suppress. *See Olafisoye v. United States*, 857 A.2d 1078, 1085 (D.C.2004).

search was not incident to arrest because of a seven-hour time lapse between the arrest and the DNA collection; and they claim that the exigent circumstances exception does not apply because there was no danger that "the evidence could be easily destroyed in the time needed to get a warrant" from an emergency judge. The government argues that "exigent circumstances justified seizing the penile swabs without a warrant or court order because a delay could have compromised the evidence." The trial court found that this was "clearly a case [where] exigent circumstances" required the government to obtain the penile swabs without a warrant or court order, particularly because appellants could have contaminated the DNA evidence or washed it away.[20]

■ "In reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Green v. United States*, 974 A.2d 248, 255 (D.C.2009) (quoting *Shelton v. United States*, 929 A.2d 420, 423 (D.C.2007)) (internal quotation marks omitted). "[W]e defer to the trial court's factual findings unless clearly erroneous...." *Pleasant–Bey v. United States*, 988 A.2d 496, 500 (D.C.2010). However, we "review *de novo* the trial court's legal conclusions." *Prince v. United States*, 825 A.2d 928, 931 (D.C.2003) (citing *Gomez v. United States*, 597 A.2d 884, 889 (D.C. 1991)). " 'Essentially, our role is to ensure that the trial court had a substantial basis for concluding that no constitutional violation occurred.' " *Green, supra*, 974 A.2d at 255 (quoting *Brown v. United States*, 590 A.2d 1008, 1020 (D.C.1991)).

■ "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Presumptively, the search of an individual requires either a warrant or a court order, except in cases where the search was incident to arrest or where exigent circumstances existed. *See Gustafson v. Florida*, 414 U.S. 260, 264, 94 S.Ct. 494, 38 L.Ed.2d 427 (1973). Exigent circumstances which justify the warrantless search of an individual's person may exist where "the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.' " *Schmerber, supra*, 384 U.S. at 770, 86 S.Ct. 1826.

We are convinced that the trial court properly denied the motion to suppress the penile swab evidence by applying the exigent circumstances doctrine to this case. In response to cross-examination questions, Officer Strong, who gave instructions to Mr. Kaliku and Mr. Matthews about how to obtain the penile swab samples, testified that he did not seek a court order or transport the appellants to a hospital where the sample could have been taken because "[e]vidence could have been wiped away ... [or] contaminated ... [or] rubbed away at any time." Because of the delicate nature of the DNA evidence in this case and the area in which it was located, it could easily have disappeared. Therefore, there was an urgency to its collection which justified the officer's reliance on exigent circumstances, rather than seeking a court order. *Schmerber, supra*, 384 U.S. at 770, 86 S.Ct. 1826 ("The officer ... might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a war-

---

**20.** The trial court also thought that the Fourth Amendment suppression issue could be resolved as a search incident to an arrest, but we see no need to examine this alternative ground as a basis for sustaining the trial court's ruling.

rant, under the circumstances, threatened the destruction of evidence") (internal quotation marks and citation omitted).

## The Show-up Identification Issue

 Mr. Matthews contends that the trial court's decision not to suppress the show-up identifications made by Mr. Jones and Ms. Hill constitutes an abuse of discretion.[21] He states that the testimony of the two witnesses "amply demonstrated the dangers of show up identification procedures"; his main argument is that the identifications of Ms. Hill and Mr. Jones were unreliable. He complains that the trial court reserved its ruling on reliability until trial, but the court never made the determination. He maintains that "[t]his case shows the shortcomings of the procedure adopted these last few years by the trial courts—to delay the reliability determination until trial, saving time." He argues that "[h]ad the defendants been permitted to call the complainants at the [suppression] hearing, the judge would have had the information necessary to suppress the [identifications] then." The government takes the position that the show-up identifications were not unduly or impermissibly suggestive; hence, the trial court was not required to make any explicit findings regarding reliability. In addition, the government points out that Mr. Matthews never requested "specific reliability findings."

During the suppression hearing, the trial court declared that there was "nothing from the evidence ... which indicate[d] ... that the police acted in any way that was impermissibly suggestive in how they

brought [the witnesses] to the scene, how [the police] separated [the witnesses], [or] had [the witnesses] each conduct the identification procedure." Prior to Ms. Hill's trial testimony, counsel for Mr. Kaliku brought up the trial court's reliability determination and stated: "It's our position that, based on the record as it stands now, there isn't enough reliability in the fact pattern that's been developed for the court to allow an out-of-court identification, and I wanted to put that on the record." The trial court responded, "I disagree." Counsel for Mr. Matthews said nothing. Neither Mr. Matthews nor Mr. Kaliku requested specific reliability findings after Ms. Hill's testimony, nor before or after Mr. Jones's testimony.

 "This court is bound by the trial court's findings on whether identification procedures were impermissibly suggestive and whether an identification was reliable if they are supported by the evidence and in accordance with the law." *Howard v. United States,* 954 A.2d 415, 423 (D.C.2008) (quoting *Turner v. United States,* 622 A.2d 667, 672 n. 3 (D.C.1993)) (internal quotation marks omitted). In order to prevail on his motion, Mr. Matthews must first demonstrate that the identification procedure was "'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)).[22] Second, "if the procedure

21. Mr. Kaliku does not challenge the trial court's denial of the motion to suppress the show-up identifications.

22. Our cases have tended to drop the word "irreparable" before "misidentification," but they also cite *Neil v. Biggers.* See *Forte v. United States,* 856 A.2d 567 (D.C.2004) ("A

defendant ... must show that the identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification.'") *Id.* at 573 (citing *Turner, supra,* 622 A.2d at 672 n. 4) (citing *Neil v. Biggers,* 409 U.S. at 198, 93 S.Ct. 375).

is found impermissibly suggestive, the government may defeat the motion and save the identification by carrying the burden of producing evidence to show that, under all the circumstances, the identification was reliable nonetheless." *Id.* (quoting *Maddox v. United States,* 745 A.2d 284, 292 (D.C.2000)) (internal quotation marks omitted).

Mr. Matthews never really articulates the specific identification procedures that, in his view, constituted impermissible suggestivity. Rather, he focuses generally on "the dangers of show-up identification procedures, which are inherently suggestive." As the case law teaches, some suggestivity is inherent in the process, but " 'a defendant is not denied due process of law unless, in the totality of the circumstances, the on-scene confrontation was *unnecessarily* suggestive and conducive to the substantial likelihood of irreparable misidentification.' " *Diggs v. United States,* 906 A.2d 290, 300–01 (D.C.2006) (quoting *Forte, supra,* 856 A.2d at 573) (emphasis in original). Based upon our review of the record, we are persuaded that the show-up identification process was not unnecessarily suggestive or conducive to a substantial likelihood of irreparable misidentification. Ms. Hill and Mr. Jones were placed in separate cars to avoid tainting their identifications; the show-up procedure took place within thirty minutes of the robbery and sexual assault; the headlights, spotlights, and "take-down lights" of the police cars were all illuminated and focused on each appellant; and Mr. Jones and Ms. Hill were taken separately to a spot underneath a street light for the identification. Neither the presence of the police nor the appearance of defendants in handcuffs made the procedure impermissively suggestive. *See Diggs, supra,* 906 A.2d at 300.

As to the question of reliability, we have "encouraged trial judges to conduct both [the undue suggestivity and the reliability] steps of the inquiry into a challenged . . . identification procedure." *Howard, supra,* 954 A.2d at 423 n. 6. Nevertheless, "[n]o reliability determination is required unless the court has determined that the eyewitness identification was unduly suggestive." *Scales v. United States,* 687 A.2d 927, 937 n. 15 (D.C.1996) (citing *Greenwood v. United States,* 659 A.2d 825, 827–28 (D.C.1995)) (other citation omitted). Moreover, since Mr. Matthews did not request specific reliability findings, "the issue has not been preserved." *Id.* at 937.

### The Alleged Trial Court Bias Issue

Mr. Matthews claims that the trial judge's alleged hostility toward and admonishment of Mr. Kaliku's trial counsel directly and negatively affected his opportunity for a fair trial, because the jury could have perceived the judge's admonishments as "an expression of a positive opinion by the judge as to the credibility of the two complaining witnesses." Therefore, he argues, the trial court should have severed the defendants in order to avoid "spillover" prejudice to Mr. Matthews. Mr. Kaliku adopts the arguments put forth by Mr. Matthews, but he also contends that the trial judge's "numerous interruptions and remarks chastising [his trial] counsel, as well as [the trial judge's] display of frustration and impatience toward his counsel during cross-examination of [Ms. Hill and Mr. Jones] prejudiced the defendant notwithstanding the strong evidence against him." He maintains that the judge's attitude during trial and his comments to Mr. Kaliku's counsel thwarted a number of attempts to "legitimately impeach the [government's] two witnesses," and ultimately "prejudiced [Mr.] Kaliku in the eyes of the jury."

The government asserts that, when "viewed in context, there was nothing improper about any of the comments with which [Mr. Kaliku and Mr. Matthews] find fault" because the trial judge's comments consisted only of "judicial rulings, routine trial administration efforts, and ordinary admonishments" warranted by Mr. Kaliku's counsel's repetitive lines of inquiry and his failure to comply with the trial court's objection rulings. The government argues that the trial court eliminated any potential juror perceptions of bias by instructing the jury that the judge's rulings on objections, its comments to counsel, and its questions or comments to witnesses were all "concerned only with legal matters or with clarifying a question and [were] not to be taken ... as indicating [the judge's] view about how [to] decide the facts."

■■■■ During trial, the judge "must remain a disinterested and objective participant in the proceeding, and must not be clearly hostile to or align himself with any of the parties at trial." *Thacker v. United States*, 599 A.2d 52, 63 (D.C.1991) (citations, brackets, and internal quotation marks omitted). However, "[a] trial judge has an obligation to prevent improprieties during trial, and may rebuke counsel for improper conduct." *Chase v. United States*, 656 A.2d 1151, 1155 (D.C.1995). "[I]t is undoubtedly within the judge's province to admonish and rebuke counsel as occasion may require, and to use other preventative measures necessary to maintain the dignity of the court." *Rosenberg v. District of Columbia*, 66 A.2d 489, 490 (D.C.1949). "[I]n rebuking counsel[,] the degree of severity is left to the trial judge so long as it does not prevent the party

from having a fair trial." *Rosenberg, supra*, 66 A.2d at 490. In order to preserve a claim of judicial bias, an appellant must complain of the alleged bias at trial; otherwise, we review such claims under a plain error standard. *See Plummer v. United States*, 870 A.2d 539, 547 (D.C.2005). "In all but the most extreme cases, rulings during courtroom proceedings do not constitute evidence of judicial bias." [23] *Id.* (citing *In re J.A.*, 601 A.2d 69, 76 (D.C. 1991)).

While the record indicates that there were multiple instances where the trial judge made interjections during cross-examination by Mr. Kaliku's counsel, we believe that the interjections were proper and did not evidence any judicial bias. When the trial court did interject, it was most often (1) because counsel's line of questioning was inappropriate, or constituted an inadmissible attack on the witness's credibility; (2) to admonish counsel for disobeying the trial court's ruling; or (3) because counsel's line of inquiry was repetitive. The trial court interjected in an attempt to "maintain the dignity of the court," *Rosenberg, supra*, 66 A.2d at 490, and to "prevent improprieties during trial," *Chase, supra*, 656 A.2d at 1155. Moreover, the record reflects a certain level of patience on the judge's part with counsel's obviously repetitive conduct, despite the trial court's ruling that a question had been asked and answered. In addition, the record shows there was a sufficient "measure of cordiality between the court and counsel." *Plummer, supra*, 870 A.2d at 547. Significantly, the trial judge's remarks did not show any "positive opinion ... as to the credibility of the two complaining witnesses," as Mr. Matthews sug-

---

**23.** Mr. Kaliku made no claim of judicial bias in the trial court; therefore we review his claim only for plain error, a standard he cannot meet on this record. *See Lampkins v.*

*United States*, 973 A.2d 171, 172–73 (D.C. 2009) (citing *Plummer, supra*, 870 A.2d at 547).

gests, and its jury instructions were sufficient to avoid any judicial bias that jurors may have perceived, and to obviate any need for severance or a mistrial declaration.

### The Cross–Examination Issue

■■ Mr. Kaliku and Mr. Matthews claim that the trial court violated their Sixth Amendment confrontation rights when it improperly limited the cross-examination of Ms. Hill, with respect to her "common practices" as a prostitute. Specifically, appellants contend that their limited ability to question Ms. Hill prevented them from demonstrating that "Mr. Jones and Ms. Hill were acquainted beyond his being a mere customer of hers," and that this relationship "was directly relevant to their bias and motive to lie" in order "to protect Mr. Jones from any pandering charges, and to punish the defendants for shorting the two on the money." Appellants also contend that the limited cross-examination of Mr. Jones prevented them from demonstrating that Mr. Jones had "misled the jury when he asserted that he'd worked for Metro for the four years prior to the alleged crimes" since he had been incarcerated during that time, and the court's ruling also prohibited them from "showing Mr. Jones['s] sensitivity and defensiveness to a charge that directly supported the defense," that is, "he had been working with Ms. Hill as her pimp."

The government asserts that defense counsel's questions regarding Ms. Hill's previous conduct as a prostitute were irrelevant and improper, because a woman's past sexual history has no bearing on whether she engaged in consensual sex with a particular defendant, even if that woman is a prostitute. In addition, the government maintains that the questions regarding Mr. Jones's alleged incarceration constituted an unfair attack on his credibility and that the questions constitut-ed an attempt "to distract the jury with a collateral matter." Finally, with respect to both witnesses, the government asserts that the trial court's allowance of other lines of inquiry was sufficient to establish witness bias, if any existed at all.

Despite the trial court's ruling that counsel for Mr. Kaliku could ask Ms. Hill about the night in question but not "other details about her prostitution prior to the night in question," counsel for Mr. Kaliku persisted in asking questions about her "routine." Therefore, the trial judge requested a proffer from counsel as to why the court's "ruling [was] wrong." Counsel replied: "[W]e need to be able to demonstrate that not only was she an admitted prostitute but her routine was to pick people up on New York Avenue and then to go to this quiet neighborhood to conduct the service." There was no proffer about any prior link or association between Ms. Hill and Mr. Jones. When counsel asked Mr. Jones, "[I]sn't it a fact that you knew Ms. Hill before [the night in question]?" He answered, "No sir." To the follow-up questions whether Mr. Jones "worked essentially as a pimp or a panderer for Ms. Hill," and whether he was working for Metro in April 2006, Mr. Jones stated, "I work for Metro, sir[;] I've been working for Metro for four years." The trial judge called a bench conference upon hearing counsel's next question—"There was a period of time when you were locked up for these other offenses, correct?" The court admonished counsel for "a totally inappropriate question," and asked counsel for an explanation. Counsel responded that he wanted to show that Mr. Jones's statement about working for Metro for four years was "not accurate, because he was locked up for a period of time."

In this court, appellants expand on their rationale for wanting to pose questions to Ms. Hill about her "routine," and to Mr.

Jones about his employment. Mr. Matthews states that his trial counsel "wanted to ask [Ms. Hill] about whether she had a habit in her work of going to the same area to conduct the sex portion of her business." He adds a rationale, related to the defense theory of consensual sex and to the defense belief that Ms. Hill was biased and had a motive to fabricate what actually took place on April 30, 2006, and that Mr. Jones also had a motive to lie:

The defense theory presented at trial was that the sexual contact between the defendants and Ms. Hill was consensual, for money. The further assertion of the defense was that Mr. Jones and Ms. Hill were acquainted beyond his being a mere customer of hers. Mr. Matthews['s] testimony was that the two men followed Mr. Jones' car to the quiet street near the police station because Ms. Hill had told them to do that. The defense wanted to show, through her own responses, that she ordinarily would provide a customer with a place to go, as well as providing herself with some protection, in the form of another person, or persons, to be close enough to the events if trouble arose.

Ms. Hill's version at the trial was that she did not direct the men to any particular area, and that she had no one out there with her for protection. The restriction of the cross[-]examination forced the defense to accept this version, because it could provide no context by reference to common practices.

Mr. Matthews points out that the two themselves gave an initial version of events to police saying that they were boyfriend and girlfriend. They admitted[ ] this fact, but testified that the initial version was a lie to protect themselves. The defense theory was that the second version was also a lie, to protect Mr. Jones from any pandering charges, and to punish the defendants for shorting the two on the money.

This expanded rationale was not expressly conveyed to the trial court.

▮▮▮ Once the trial court has allowed sufficient "meaningful" cross-examination, consistent with a defendant's constitutional Confrontation Clause right, "this right is subject to reasonable limits imposed at the discretion of the trial judge." *Scott v. United States*, 953 A.2d 1082, 1087 (D.C.2008) (quoting *Flores v. United States*, 698 A.2d 474, 479 (D.C. 1997)) (internal quotation marks omitted). As such, "a trial judge may curtail cross-examination because of concerns of harassment, prejudice, confusion of the issues, the safety of the witness, or interrogation that is repetitive or only marginally relevant, without violating a defendant's rights under the Confrontation Clause." *Jones v. United States*, 853 A.2d, 146, 152 (D.C. 2004) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

▮▮▮ Questions pertaining to witness bias constitute "permissible subject [matter] during cross-examination," and a trial judge may not "prohibit *all* inquiry . . . that a jury might reasonably have found caused bias." *Id.* (emphasis added). Nevertheless, bias inquiries are not unrestricted; "we have required that the examiner have a reasonable factual foundation or at least a 'well-reasoned suspicion' that the circumstances indicating bias might be true." *Brown v. United States*, 952 A.2d 942, 947 (D.C.2008) (quoting *Fuller v. United States*, 873 A.2d 1108, 1113 (D.C. 2005)). We will reverse the trial court's rulings relating to bias only if there has been an abuse of discretion. *Scott, supra,* 953 A.2d at 1091.

▮▮▮ We conclude, on this record, that appellants never proffered to the trial

court the expanded rationale for cross-examination of Ms. Hill and Mr. Jones that they present on appeal. Moreover, in Ms. Hill's case, the desired cross-examination would have been extremely prejudicial. Under the Rape Shield Law, D.C.Code §§ 22–3021 and –3022 (2001), "evidence of a victim's sexual history with someone other than the defendant is generally inadmissible" in a sex offense case. *Bryant v. United States,* 859 A.2d 1093, 1104 (D.C. 2004). Therefore, defense counsel's attempts to establish Ms. Hill's "routine" with other sexual clientele, may well have focused on her previous sexual history, and may have resulted in inadmissible attacks on her credibility. In addition, appellants had other opportunities to expose Ms. Hill's bias within the confines of the trial court's limitation. In short, on this record, we cannot say that the trial court abused its discretion in limiting the cross-examination of either Ms. Hill or Mr. Jones.[24]

### The Evidentiary Sufficiency Issue (Aiding and Abetting Kidnapping)

Mr. Kaliku argues that there was insufficient evidence to sustain his conviction for aiding and abetting the kidnapping of Ms. Hill, because the government's evidence failed to demonstrate that he had knowledge that Mr. Matthews would kidnap Ms. Hill or that he, Mr. Kaliku, "committed any act in furtherance of the kidnap[p]ing." The government maintains that "[a]t the very least, [Mr.] Kaliku's brandishment of the gun intimidated [Ms.] Hill and this facilitated [Mr.] Matthews's ability to lead her away." The government further contends that "[Mr.] Kaliku's later announcement that he wanted to

have sex with [Ms.] Hill encouraged [Mr.] Matthews to detain [her]." We agree with the government.

In an evidentiary sufficiency challenge, this court "view[s] the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Green v. United States,* 948 A.2d 554, 563 (D.C.2008) (quoting *Gibson v. United States,* 792 A.2d 1059, 1065 (D.C. 2002)) (internal quotation marks omitted). "It is only where there is 'no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt' that the evidence is insufficient to support a conviction." *Id.* (quoting *Gibson, supra,* 792 A.2d at 1065).

To convict Mr. Kaliku of aiding and abetting, the government had to present at least some probative evidence that "(1) a crime was committed by someone; (2) [Mr. Kaliku] assisted or participated in its commission; and (3) [Mr. Kaliku] did so with guilty knowledge." *McCullough v. United States,* 827 A.2d 48, 57 (D.C.2003) (citing *Blakeney v. United States,* 653 A.2d 365, 370 (D.C.1995)). "While [Mr. Kaliku's] mere presence at the scene of the crime [was] insufficient to establish [his] criminal participation in the offense, proof of presence at the scene plus some conduct which designedly encourages or facilitates a crime will support an inference of [Mr. Kaliku's] guilty participation in the crime as an aider and abettor." *Downing v. United States,* 929 A.2d 848, 862 (D.C. 2007) (citation and internal quotation marks omitted). Relatedly, to sustain a

---

**24.** The trial court also acted within its discretion in limiting defense counsel's inquiry into Mr. Jones's previous incarceration. This line of inquiry was indeed a collateral attack on Mr. Jones's credibility; whether he was incarcerated during the four years that he worked for Metro had no bearing on his credibility or lack thereof as a witness with respect to the alleged robbery. The defense had ample opportunity to cast doubt on Mr. Jones's credibility or establish witness bias in its other lines of inquiry.

conviction for kidnapping while armed, the government must prove that appellants, while armed, intentionally seized, confined, or carried Ms. Hill away, and that they held or detained Ms. Hill against her will. *See* D.C.Code § 22–2001 (2001).

Based on our review of the record, the government presented sufficient evidence "upon which a reasonable mind might fairly conclude [Mr. Kaliku's] guilt beyond a reasonable doubt" for aiding and abetting Ms. Hill's kidnapping. *See Green, supra,* 948 A.2d at 563. Although the evidence shows that Mr. Matthews physically grabbed Ms. Hill, removed her from the vehicle at gunpoint, and directed her to the alley between the two houses, the government presented other probative evidence establishing that Mr. Kaliku assisted or participated in the kidnapping (1) by brandishing a weapon at the time of the robbery, and subsequently, by holding Ms. Hill at gunpoint, both so that Mr. Matthews could go through her purse in search of money and so that they could engage in sex acts with her; and (2) by following Mr. Matthews into the alley between the houses while Mr. Kaliku had Ms. Hill under control and announcing that he wanted to have sex with Ms. Hill, thus detaining her in the alley. On this record, then, when viewing the evidence in the light most favorable to the government, a reasonable mind could conclude that Mr. Kaliku not only participated and assisted in the kidnapping, but that he did so intentionally and "with guilty knowledge," as the statute requires for conviction. *See McCullough, supra,* 827 A.2d at 57.

### Merger Issue

■ Mr. Kaliku and Mr. Matthews both contend that the ADW counts of their indictment merge with the armed robbery counts. The government concedes that appellants are correct, and that "the con-victions for ADW, and for the corresponding counts of PFCV [should] be vacated." Hence, we remand the case to the trial court with instructions to vacate the ADW convictions, and the corresponding PFCV counts. *See Simms v. United States,* 634 A.2d 442, 447 (D.C.1993); *Owens v. United States,* 497 A.2d 1086, 1096 (D.C.1985).

■ Mr. Matthews independently maintains that his threats conviction is a lesser-included offense of his kidnapping conviction because "the threat involved here [was] co-extensive with the 'coercion' element of the kidnap[p]ing charge," and thus the counts should merge. "We review a claim of merger of convictions *de novo* 'to determine whether there has been a violation of the Double Jeopardy Clause of the Fifth Amendment.'" *Sanchez–Rengifo v. United States,* 815 A.2d 351, 354 (D.C.2002) (quoting *Maddox v. United States,* 745 A.2d 284, 294 (D.C.2000)). The Double Jeopardy Clause "does not prohibit separate and cumulative punishment for separate criminal acts." *Bryant v. United States,* 859 A.2d 1093, 1108 (D.C.2004) (citations and internal quotations omitted).

We agree with the government that the threats and kidnapping convictions do not merge under the analysis in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). As we said in *Frye v. United States,* "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 926 A.2d 1085, 1098 (D.C. 2005) (quoting *Blockburger, supra,* 284 U.S. at 304, 52 S.Ct. 180). In this jurisdiction, "the *Blockburger* rule has been codified ... in D.C.Code § 23–112 (2001)." *Bryant, supra,* 859 A.2d at 1108.

The elements that constitute the offense of threats to do bodily harm are: (1) " 'that the [appellant] uttered words to another person' "; (2) " 'that the words were of such a nature as to convey fear of ... bodily harm or injury to the ordinary hearer' "; and (3) " 'that the [appellant] intended to utter the words which constituted the threat.' " *Evans v. United States*, 779 A.2d 891, 894 (D.C.2001) (quoting *Campbell v. United States*, 450 A.2d 428, 431 n. 5 (D.C.1982)). The elements of kidnapping require proof that Mr. Matthews seized, confined, or carried Ms. Hill away, and that he then held, detained, or intended to hold or detain Ms. Hill. *See* D.C.Code § 22–2001 (2001). Under the *Blockburger* test, the offenses each require proof of one or more elements that the other offense does not: kidnapping does not require the utterance of words, and threats do not require some form of seizure and detention. Although coercion might coincidentally overlap with the threats offense when the crime occurs, it is not an explicit element of the offense, and thus cannot be imputed as an inherent element of the crime. Hence, the two offenses do not merge.

Finally, Mr. Matthews asserts that the kidnapping charge should merge with one of the sexual assault counts because "kidnap[p]ing in the indictment was for the purpose of sexual contact," and the "movement [of Ms. Hill] was slight[ ] and did little to facilitate the sexual contact." We also agree with the government, that under our *Blockburger* analysis, these convictions do not merge. An individual is guilty of first-degree sexual abuse

> [I]f that person engages in or causes another person to engage in or submit to a sexual act ... (1) by using force against that other person; (2) by threatening or placing that person in reasonable fear that any person will be subjected to death, bodily injury, or kidnapping; (3) after rendering that other person unconscious; or (4) after administering to that other person ... a drug, intoxicant, or other similar substance.

D.C.Code § 22–3002 (2001). As indicated, *supra*, kidnapping requires that Mr. Matthews seize Ms. Hill in some fashion, and that he then detain or intend to detain her. As we noted in *Bryant*, "detention is not an element of sexual abuse." 859 A.2d at 1108. Moreover, Mr. Matthews's contention that the "movement [of Ms. Hill] was slight ... and could have been accomplished by automobile" is irrelevant to the elements of the offenses considered under *Blockburger*. In sum, "each offense has at least one element that the other does not have, thereby precluding merger." *Id.*

Accordingly, for the foregoing reasons, we affirm the judgments of the trial court, but we remand the case with instructions to vacate the ADW convictions of both Mr. Kaliku and Mr. Matthews, and the corresponding PFCV counts.

*So ordered.*